**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **JOHN M. PITMAN, III** | ) |
| | ) |
| **and** | ) |
| | ) |
| **PENINSULA PLASTIC SURGERY CENTER, LTD** | ) Civil Action No.: |
| | ) **4:16-cv-00179-HCM-DEM** |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) |
| | ) |
| **XCENTRIC VENTURES, LLC** | ) |
| | ) |
| **and** | ) |
| | ) |
| **EDWARD MAGEDSON** | ) |
| | ) |
| **and** | ) |
| | ) |
| **DARREN M. MEADE** | ) |
| | ) |
| **and** | ) |
| | ) |
| **TRACEY A. RICHTER** | ) |
| | ) |
| **and** | ) |
| | ) |
| **ANNA RICHTER** | ) |
| | ) |
| **and** | ) |
| | ) |
| **BERT PITMAN (a/k/a BERT RICHTER)** | ) |
| | ) |
| *Defendants.* | ) |

## FIRST AMENDED COMPLAINT

Plaintiffs, John M. Pitman ("Pitman") and Peninsula Plastic Surgery Center, LTD.

("PPS') (collectively the "Plaintiffs") by and through their attorney, as and for their First

Amended Complaint against Defendants, Xcentric Ventures, LLC, Edward Magedson,

Darren M. Meade, Tracey A. Richter, Anna Richter, and Bert Pitman a.k.a. Bert Richter

1

(collectively the "Defendants") based upon their personal knowledge, information and belief, states as follows:

## NATURE OF THE ACTION

1.      This is a complex civil action alleging causes of action for tortious interference, common law conspiracy, and civil conspiracy under Virginia Code §18.2-499 -500 as well as claims for declaratory and injunctive relief.

2.      The primary cause of action is based upon a combined and concurring widespread conspiracy organized and executed jointly and severally on behalf of the Defendants across state lines.

3.      The acts alleged herein, relate to defamation, extortion, conspiracy to commit extortion, retaliation against a witness, and witness tampering.

4.      The primary and ongoing objective of the Defendants, combined and concurrent, has been and continues to be to jointly and severally inflict severe and sustained economic hardship upon the Plaintiffs and to destroy their professions and reputations.

5.      This lawsuit seeks: (1) direct and consequential damages; (2) compensatory damages, (3) punitive damages, (4) attorneys' fees, costs, expert witness fees, (5) both pre-and-post-judgment interest, and (6) injunctive relief.

## THE PARTIES

6.      Plaintiff John Pitman is now, and at all times material to this Complaint, a citizen of the Commonwealth of Virginia residing in Williamsburg, Virginia.  Plaintiff is a medical doctor who is board certified in plastic surgery.  Pitman has extensive medical training and has performed thousands of successful surgeries throughout his distinguished medical career.  Pitman opened his private practice in 1996 in Newport News, Virginia,

which operated successfully for many years. Pitman enjoyed an excellent professional and personal reputation. In additional to his medical practice, Pitman serves his country as a reservist member of the U.S. Army Medical Corps. His military service included four (4) active duty tours at Walter Reed Amery Medical Center in support of Operation Enduring Freedom and Operation of Iraqi Freedom. He also served active duty in Afghanistan in support of Operation Resolute Support. Pitman's distinguished military career includes various awards and commendations, including the Purple Heart, Combat Action Badge, Army Commendation Medal (his fourth), and Afghanistan Campaign Ribbon.

7.      Plaintiff Peninsula Plastic Surgery Center is now, and at all times material to this Complaint, a Virginia Corporation located in Williamsburg, Virginia. Pitman is the sole owner of PPS.

8.      Tracey Richter ("Richter"), an individual, is now, and at all times material to this Complaint, a citizen of the State of Iowa residing in Mitchellville, Iowa. Richter is a convicted murderer and is currently serving a life sentence in the Iowa Correctional Institution for Women.

9.      Anna Richter ("A. Richter"), an individual, is now, and at all times material to this Complaint, a citizen of the State of Iowa residing in Urbandale, Iowa. A. Richter is the mother of Richter and one of her closest confidants.

10.     Bert Pitman ("B. Pitman"), an individual, was at all times material to this Complaint, a citizen of the Commonwealth of Virginia residing in various locations throughout the Commonwealth of Virginia. The actions described herein regarding B. Pitman were done in the Commonwealth of Virginia. At the time of the filing of the

Complaint, however, B. Pitman was a citizen of the State of Iowa residing in Urbandale, Iowa. B. Pitman is the son of Richter and one of her closest confidants. B. Pitman may also be known as Bert Richter.

11.     Xcentric Ventures, LLC ("Xcentric") is now, and at all times material to this Complaint, an Arizona Limited Liability Company located in Phoenix, Arizona. Xcentric is an internet content provider and runs a website with a URL of [http://www.ripoffreport.com](http://www.ripoffreport.com) ("Ripoff Report"). The Ripoff Report can be accessed in the Commonwealth of Virginia and has directed content towards citizens of the Commonwealth of Virginia. Upon information and belief, Xcentric transacts business in the Commonwealth of Virginia and/or derives revenue from the Commonwealth of Virginia.

12.     Darren M. Meade ("Meade"), an individual, is now, and at all times material to this Complaint, a citizen of the State of California residing in Laguna Beach, California. Meade was at all relevant times an employee and/or agent of Xcentric and was paid to generate content for the Ripoff Report.

13.     Edward Magedson ("Magedson"), an individual, is now, and at all times material to this Complaint, a citizen of the State of Arizona residing in Fountain Hills, Arizona. Magedson founded Xcentric and started the Ripoff Report in 1997. At all times material to this Complaint, Magedson was an owner, manager, employee, and/or agent of Xcentric.

## JURISDICTION AND VENUE

14.     Personal jurisdiction over all of the Defendants is proper because the Defendants, both individually and collectively, caused tortious injury in the

Commonwealth of Virginia and those acts were the direct and proximate cause of the injuries described herein. Va. Code § 8.01-328.1(A)(3). Likewise, personal jurisdiction is proper over the Defendants because they, individually and collectively, caused tortious injury in the Commonwealth of Virginia and they engaged in persistent course of conduct, transacted business and/or derived substantially revenue from the Commonwealth of Virginia. Va. Code § 8.01-328.1(A)(4). Personal jurisdiction is also proper over all of the Defendants because the Defendants engaged in a conspiracy to injure the Plaintiffs and members of the conspiracy knowingly took acts in furtherance of their conspiracy in the Commonwealth of Virginia.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)-(c) because a substantial part of the events that give rise to the Plaintiffs' claims against the Defendants arose in this district, and the Defendants are subject to personal jurisdiction in this district at the time this action was commenced.

## FACTS

### *Xcentric and Magedson Form the RipoffReport.com to Allow Users to Post Content*

16. Magedson is the manager of Xcentric and the creator of the Ripoff Report website. The website was launched in 1997 under the claim that it assists customers to be able to take action for themselves. Ripoff Report's home page has a tag line that states: "By consumers, for consumers" and "Don't let them get away with it. Let the truth be known."

17. The Ripoff Report allows users to complain anonymously about any firm or person. Reports added to the website are not automatically posted, but must be

approved by the site. According to Ripoff Report's Terms of Service, users are required to affirm that the content they post is truthful and accurate.

18.      Companies or individuals who have been named in a report may respond with a rebuttal on the webpage.

19.      Since its inception, Ripoff Report has grown in popularity. In a typical week, more than 1 million visitors access Ripoff Report. It has been ranked among the top 1000 U.S. websites in terms of internet traffic.

20.      Ripoff Report has several revenue streams. It sells ad space on its website and offers companies the option to pay for complaint investigations which can range in value from $5,500.00 and up to $100,000.00. Those who have been named in a complaint can also pay $2,000.00 to have a third-party arbitrator evaluate the posting. The site generates several million dollars of revenue a year. Upon information and belief, the Ripoff Report generates revenue from its contacts with the Commonwealth of Virginia.

21.      Through unique internet coding and search engine optimization, Ripoff Report is able to cause its pages to appear at or near the top of internet search engine results. For example, much of the content generated by the Ripoff Report will automatically appear on the first page of a Google search.

22.      Ripoff Report has a tab on its homepage entitled "Consumer Resources." Ripoff Report provides editorial content on its site and in the Consumer Resource section.

23.      Ripoff Report has various employees who are paid to manage the website and oversee its content. The website also pays for content which it posts on the site.

24.     Xcentric is not merely a website operator because even after a user posts statements on the Ripoff Report and the user indicates that he or she wants their postings removed, Ripoff Report makes the decision to leave and/or keep the posting on the website, without regard to the personal directive of the user.  In doing so, Xcentric takes ownership of the content of the posting and the content therein, thereby making the misinformation and defamatory statements at issue Xcentric's own misinformation and defamation as set forth herein.  Additionally, Xcentric was paying for the content generated as set forth herein and taking ownership thereof through monetary gain.

25.     Xcentric, in deciding to keep knowingly false statements made by users and those on its payroll, has for all intents and purposes become the publisher of those posts and statements contained therein.

*Events Pre-Dating The Killing of Dustin Wehde*

26.     Pitman and Richter were married on August 14, 1988.  The marriage produced one child, B. Pitman, who was born on February 1, 1990.  In June, 1992, Pitman and Richter separated and Richter filed for divorce.  Their divorce proceedings were highly contentious and lasted approximately six years.  During the divorce proceedings, Richter falsely accused Pitman of sexual molestation of their son immediately after Pitman raised concerns about physical mistreatment of their son during a deposition.  Pitman denied the allegations and contended that Richter forged his signature on a life insurance application.  There were also allegations that Richter tried to kill Pitman.  The divorce concluded with Richter and Pitman being awarded joint legal custody, with Richter being the primary custodian and Pitman having visitation rights.

27.     After the divorce, Richter met and subsequently married Michael Roberts in 1996. This marriage produced two children.

28.     In 1998, Richter and Michael Roberts moved from Chicago, Illinois to Early, Iowa. During their residency in Early, Iowa, Richter met and befriended her neighbor Dustin Wehde ("Wehde").

29.     Two years later, Richter again falsely accused Pitman of molesting their son shortly after her current Husband was jailed on domestic violence charges. Pitman denied the allegation and asked the court to award him full custody in an effort to deflect the repeated attempts of Richter to alienate their son from Pitman by denying visitation on multiple occasions. A final custody/visitation hearing involving Pitman and Richter was scheduled to be heard in December, 2001.

*The Aftermath of the Wehde Murder*

30.     Days before the custody hearing between Pitman and Richter, Wehde was killed. Richter, using two (2) different firearms, fired eleven shots at Wehde. Nine bullets struck Wehde. An expert later testified that one of those three shots had been fired into the victim's skull about fifteen minutes after the first two. B. Pitman was present in the home when Wehde was murdered.

31.     Richter claimed she was acting in self-defense and that Wehde broke into her home and attacked her. During the murder investigation, law enforcement located a spiral notebook in Wehde's car which contained what appeared to be a journal maintained by Wehde. The journal claimed that Wehde was hired by Pitman and his attorney to stalk, harass and ultimately murder Richter and her son. The existence of the notebook was not made public.

32.     Two months after the murder, Richter confided in a friend that law enforcement discovered the notebook which proved that Pitman was responsible for the home invasion and attempt on her life.

33.     On February 13, 2002, Richter sent the investigating officer a letter outlining the reasons why she believed Pitman was involved in the home invasion and attack.  Subsequently, Richter attempted to persuade law enforcement to arrest Pitman.

34.     Despite Richter's requests that law enforcement investigate Pitman, Pitman was never charged or arrested in connection with the incident and was rapidly cleared of any possible involvement in the shooting.

35.     Richter was not initially arrested or charged with the murder of Wehde.

36.     Approximately two years after the murder, Wehde's estate filed a wrongful death lawsuit against Richter, which was ultimately dismissed.  Eight months later, in 2004, Michael Roberts filed for divorce from Richter.  These divorce proceedings were also contentious and Richter made allegations that Michael Roberts was guilty of domestic and child abuse.  Michael Roberts also claimed that Richter tried to kill him.

37.     In 2005, Richter, who was still obsessed with the murder, asked law enforcement about the spiral notebook recovered from the murder scene.

38.     On January 31, 2008, the Buena Vista District Court, entered its final order in the Michael Roberts and Richter's custody/visitation proceedings.  While the court awarded Richter with primary custody the court stated "Tracey is very deviceful [sic]; she usually has a plan or scheme to effect [sic] a purpose."

39.     In 2010, in separate cases, Richter was convicted of felony fraud (in Nebraska) and perjury (in Iowa).  However, no charges were filed against anyone in connection with Wehde's murder for nearly 10 years and Richter's story of a botched home invasion appeared to be well-taken.

*Richter is Charged with Murder*

40.     In November 2010, Ben Smith ("Smith") was elected to serve as Sac County (Iowa) Attorney.  Soon after he took office, he began an investigation into the death of Wehde.  Ultimately, Smith decided to charge Richter with first degree murder.

41.     Richter was arrested on July 27, 2011.  The criminal complaint against Richter alleged that she had knowledge of evidence that was found in Dustin Wehde's car but was never publicly disclosed by law enforcement.

42.     The day Richter was arrested, her mother, A. Richter told the Sac County Attorney's office that "You have destroyed a family" and "I have nothing else to lose."

43.     Following her arrest, Richter implored her fiancé and A. Richter to contact a potential witness about a journal implicating Pitman.

44.     Richter's arrest resulted in Michael Roberts securing custody of their two children who were relocated to California and enrolled in the State of California's victim protection program.

45.     Prior to the start of Richter's trial, Meade, who had a previously contentious relationship with Michael Roberts, took an interest in Richter and her trial. Meade's interest grew into an obsession.

46.     Meade is a computer specialist who had a background in technology ventures.  At this time, Meade was forging a relationship with Magedson and Xcentric.

47.     Richter's trial began in October, 2011.  Various witnesses testified against Richter, including Pitman.  On November 7, 2011, a Webster County, Iowa jury convicted Richter for the murder of Wehde.

48.     In the days following Richter's conviction, A. Richter, B. Pitman and Meade began discussing how to overturn the conviction.  Richter was relaying defamatory and false information about Pitman and other witnesses to A. Richter and B. Pitman who provided it to Meade.  At the same time, B. Pitman was gathering information about Pitman and his business in the Commonwealth of Virginia.

49.     On December 5, 2011, Richter was sentenced to life in prison without the possibility of parole.

*Post-Trial Actions of Richter*

50.     Upset and reeling from her conviction, Richter appealed, a process that would take over a year.

51.     In December, 2012, Richter began her plans to attempt to overturn her murder conviction and life sentence.  Through A. Richter, Richter contacted Meade to assist with her post-conviction efforts.  Richter, B. Pitman, A. Richter and Meade planned to investigate witnesses and to attempt to have those witnesses recant their trial testimony.  Richter and her newly formed team were especially focused on Pitman.

52.     Acting from the Commonwealth of Virginia, B. Pitman began contacting employees of PPS and gathering additional information regarding the Plaintiffs.  This was done at the direction of the other Defendants.

53.     Meade, now an employee and/or agent of Xcentric, began using the Ripoff Report to post harassing and defamatory stories about witnesses in Richter's trial.  These posts were approved by Xcentric and maintained according to the Ripoff Report's

practices outlined above. Anna Richter and B. Pitman made similar posts (either anonymously or using a pseudonym) which were approved and maintained according to the Ripoff Reports practices outlined above.

54. On January 1, 2012, Richter asked A. Richter to get her son to get "[Pitman's] former girlfriend, to turn on Pitman." Richter told A. Richter that "it would be heaven" and would "serve [Pitman] right" if he was betrayed by his son.

55. Richter and A. Richter asked B. Pitman to gather information that would prove Pitman lied when he testified against Richter. B. Pitman agreed and began contact employees of Pitman's plastic surgery practice to get information on Pitman. Richter asked B. Pitman to give A. Richter the contact information for Pitman's girlfriend.

56. Richter, B. Pitman, A. Richter and Meade began collectively gathering information on Pitman and PPS, PPS' employees, PPS' patients and Pitman's romantic partners. They planned to use this information to persuade Pitman to recant his trial testimony against Richter. Richter also asked that B. Pitman, Meade and A. Richter to gather information on Michael Roberts.

57. On January 3, 2012, A. Richter told Richter that Meade was going after Michael Roberts. At the same time, Meade was also investigating the Plaintiffs at the request of Richter, B, Pitman and A. Richter.

58. On January 20, 2012, Richter told B. Pitman that he needed to work his magic to talk to Pitman's nurses to see if any of them had information that would prove that Pitman lied when he testified against Richter. B. Pitman agreed and began contacting Pitman's employees and ex-girlfriends. B. Pitman and Richter agreed to

provide this information to A. Richter and Meade in an attempt to discredit and defame Pitman.

59.     The collection of information regarding the Plaintiffs, PPS employees, Pitman's ex-girlfriend and the Plaintiffs' finances occurred in the Commonwealth of Virginia.

60.     Meade, who had now solidified his relationship with Magedson, began discussing Richter's trial with him.  Magedson became interested in Richter's trial and conviction.  Xcentric employed Meade to assist in attempting to exonerate Richter. These efforts included using the Ripoff Report to discuss the case and the websites prominence to attempt to influence witnesses to change their testimony.  These efforts also included using the information Meade had collected from Richter, A. Richter and B. Pitman to formulate posts on the Ripoff Report.

61.     A. Richter, at the request of Richter, and on her own began communicating with Magedson with the assistance of Meade.  Magedson asked A. Richter to obtain information about Pitman and others so they could post it on Ripoff Report.  A. Richter and B. Pitman agreed to obtain and provide this information for use on the Ripoff Report.  Richter, A. Richter, B. Pitman and Meade also shared the information that they had previously collected concerning the Plaintiffs with Magedson and Xcentric.

62.     A. Richter began sending Meade, Magedson and Xcentric weekly packages of documents concerning Richter and her trial.  These documents included information that Meade, B. Pitman and A. Richter had gathered concerning the Plaintiffs.

63.     Xcentric, Magedson, Meade, Richter, B. Pitman and A. Richter knew Pitman was a successful plastic surgeon and had substantial income through his business, PPS.

64.     Meade, Magedson and Xcentric were interested in the Plaintiffs given their financial standing.  Given the profit structure of Ripoff Report, Xcentric and Magedson saw an opportunity for financial gain by posting information on the Ripoff Report about the Plaintiffs and then charging them substantial fees to remove or edit the posts.

*Initial Ripoff Report Postings*

65.     After Richter was convicted, posts about her case began appearing on Ripoff Report.  Many of the posts were authored by Meade and others were submitted anonymously or using pseudonyms.  All of the posts were approved and published by Xcentric.  Many posts concerning Richter were bizarre and often contained disconnected words and phrases.

66.     On September 11, 2012, Meade posted Ripoff Report complaint number 938843 which outlined what he claimed to be his independent investigation into the facts of Wehde's murder, Richter's trial and her conviction.  On September 21, 2012, Meade posted additional information about Richter's trial under the title:

> Ben Smith Prosecutorial Misconduct Allowing Witnesses To Knowingly Lie \ Tracey Richter Had Several Million Dollars Stolen By Mile2 and Xellex \ Bounty Shared Amongst Prosecution Witnesses.

67.     These and similar posts were approved by Magedson and Xcentric.  At this time, Xcentric was paying Meade for content that he posted to Ripoff Report,

including the posts concerning the Plaintiffs and Richter's trial. His posts contained the content generated by Richter, A. Richter and B. Pitman.

68. This complaint, along with its various replies, updates and rebuttals, falsely accused various witnesses who testified against Richter of committing murder, theft, perjury, and child molestation. Other posts and comments accused witnesses and those involved in Richter's trial and investigation with having sexually transmitted diseases.

*Immediately After Richter's Appeal is Denied Additional Ripoff Report's Postings Target Pitman*

69. On January 9, 2013, the Court of Appeals of Iowa affirmed Richter's murder conviction. *See State v. Richter*, 828 N.W.2d 326 (Iowa Ct. App. 2013).

70. Realizing she could not overturn her conviction through the appeals process, Richter's efforts turned more sinister. From jail, Richter contacted B. Pitman and A. Richter and requested that they begin using Meade, Madgeson and Xcentric to post false and defamatory information against the Plaintiffs in retaliation for Pitman not recanting his testimony. The Defendants agreed to the scheme to post false and defamatory information about the Plaintiffs.

71. Twelve days after Richter's appeal was denied, on January 21, 2013, complaint number 1000888 was posted on the Ripoff Report which held the following title:

> Dr. John Pitman III, MD Peninsula Plastic Surgery Center, Pitman Surgical Associates, Estranged Ex Husband Key Witness Arrested by 6 Armed Officers at Plastic Surgery Practice, United States Army Col Office Locations: Williamsburg, Hayes, Newport News Embarrassment to the prosecution knowingly lies in court, deadbeat hack plastic surgeon, United States Army Reserve Cornel Lisa Pitman Williams, Virginia

72.     Complaint number 1000888 also stated that "John Pitman, intentionally withheld information from prosecutors that he was near bankrutcy (sic) when he struck a pay-to-testify deal in the Tracey Richter murder trial. Pitman, notorious for his on-going drug use and his pay-for-play with local strippers had his car repossessed; and continued to provide boob jobs for his pole dancing friends."

73.     Complaint number 1000888 included a picture of Pitman and several "updates" to the post detailed various lawsuits in which Pitman was alleged to be involved in.

74.     One of the updates was titled "Dr. John Pitman and Michael Roberts, Vegas orgies, she/he and he/he twister, doctor prescribing pain pills for sex fueled nights." Under that post, Pitman was referred to as "Dr. Boob Job" and accused him of soliciting prostitution for plastic surgery.

75.     On January 13, 2013, A. Richter told B. Pitman "after what [Pitman] did to [Richter] I want him to know how it feels to have his name in the paper and not in a good way."

76.     On January 21, 2013, twenty-one days after Richter's appeal was denied, complaint number 1005913 was posted on the Ripoff Report. This complaint was titled:

> Dr. John Pitman cheats on wife Lisa Pitman with rapper Lachesis. Dr John Pitman broke with multiple tax IRS tax liens, finances video for Lachesis which has a brutal home invasion murder similar to th (sic) husband cheats on dead fish wife Lisa Pitman, Allisan Tucker, Tracey Richter murder trial, sac county iowa Williamsburg, Virginia.

77.     Ripoff Report complaint number 1049232 included the following title:

> Tracey Richter falsely convicted. Ben Smith Sac County Iowa Michael Roberts Rexxfield Exposed Audio recording proves Prosecutor's friend Michael Roberts motive and opportunity, confesses he claimed Dr. John Pitman baby raper. Sydney Morning Herald disgrace Sac City Iowa

78.     Magedson and Xcentric were advised by the other Defendants that they would be posting about the Plaintiffs in the manner highlighted by the above complaints which appeared on the Ripoff Report.  Meade was paid by Magedson and Xcentric for the content he posted about the Plaintiffs.  A. Richter B. Pitman, Meade and Magedson (either anonymously or using a pseudonym) were authors of some or all of the posts concerning the Plaintiffs which appeared on the Ripoff Report.  They also offered comments on the posts which disseminated false and damaging information concerning the Plaintiffs.

79.     All of the posts displayed on the Ripoff Report concerning the Plaintiffs were false and misleading.

80.     All of the posts displayed on the Ripoff Report were posted through the collective efforts of the Defendants, at the request of one or more of the Defendants and with the purpose of influencing Pitman to recant his testimony in Richter's murder trial and/or otherwise assist Richter in her post-conviction relief efforts, with the purpose of damaging the Plaintiffs' business dealings, and/or with the purpose to extort money from the Plaintiffs to remove and/or alter the posts.

81.     The Defendants also sought to impede, influence and/or obstruct the administration of justice using the Ripoff Report as a medium to transmit their false and misleading information.

82.     Upon information and belief, other complaints were posted about the Plaintiffs on the Ripoff Report with the same goals and intentions of the collective efforts of the Defendants.

*The Ripoff Report Complaints Directly Impact Pitman's Medical Practice Causing Him To Lose Substantial Business*

83. Given the prominence of Ripoff Report postings in search engine results, the complaints about the Plaintiffs began reaching the public and the Plaintiff's patients and potential patients.

84. Since its inception, PPS had been a profitable and successful plastic surgery center focused around the skills of Pitman. The business had substantial goodwill and Pitman enjoyed a good professional reputation as a plastic surgeon.

85. For example, in 2011, PPS generated over $700,000.00 in income. In prior years, PPS generated over $1,000,000.00 in income. Pitman was paid from the sales generated at PPS.

86. For PPS and Pitman to succeed and be profitable, it was necessary, year to year, for PPS to generate additional patients and to maintain the clientele it had generated in prior years.

87. PPS' greatest asset was the skill of Pitman and the goodwill it developed with its patients and the public.

88. The plastic surgery industry is very competitive. The skills of a plastic surgeon and the reputation of that surgeon are paramount in attracting patients and generating business.

89. The Plaintiffs financial success depended on maintaining its clientele, protecting its patient base, generating new patients and protecting the reputation of the business in the community.

90. Pitman's reputation in the plastic surgery profession was extremely important to PPS' success. If Pitman's reputation was tarnished in any way, it would

have a substantial negative impact on PPS' ability to recruit new patients and maintain its patient base.

91.     Plaintiffs had a business expectancy in their clients/patients and future clients/patients based upon the past success of the Plaintiffs. The past success of the Plaintiffs was an indicator of future success. The future and continued success of the Plaintiffs was reasonable and afforded them with the probability of future economic benefits.

92.     The Defendants, through their familiarity with Pitman, knew about his success and the success of PPS. Richter had an understanding of the Plaintiffs business success and financial standing due to her marriage to Pitman. Through Richter, A. Richter and B. Pitman, the other Defendants gained an understanding of the business expectancies of Pitman and PPS. Simply stated, the Defendants knew about the business expectancies of the Plaintiffs and they knew that the Plaintiffs had the potential for future income and clientele/patients. The Defendants also knew that damaging the Plaintiffs reputation would cause the Plaintiffs extreme financial hardship.

93.     After posts concerning the Plaintiffs began appearing on the Ripoff Report and with prominence in search engine results, the Plaintiffs business declined dramatically. Specifically, clients/patients left the practice, potential clients/patients (who had paid deposits for surgeries) unilaterally cancelled their scheduled surgeries, and new business declined dramatically. For example, Plaintiff's cosmetic cases dropped from approximately 111 cases in 2012 to 82 cases in 2013 and 2 cases in 2014.

*The Defendants Attempt to Extort Pitman in an Effort to Maximize Profits and Tamper with Pitman's Testimony from the Richter Murder Trial*

94.     Mere months after the first posts concerning Pitman appeared on the Ripoff Report, the Plaintiffs were contacted by an employee of Xcentric.

95.     On August 29, 2013, an employee of Xcentric called the Plaintiffs in reference to the posts on the Ripoff Report. The caller advised that the Plaintiffs could have the posts removed if they paid $10,000.00 in two payments and continued to make monthly payments into perpetuity despite the fact that Xcentric knew that said statements were false and defamatory.

96.     Employees of Xcentric, acting at the request of Magedson, demanded money from the Plaintiffs to remove the false and misleading statements posted about the Plaintiffs on the Ripoff Report.

97.     Xcentric and its employees made multiple attempts to secure money from the Plaintiffs.

98.     Meanwhile, A. Richter and T. Richter, through B. Pitman operating in Virginia, offered to intervene with the owners of the Ripoff Report on Pitman's behalf if Pitman submitted to their scheme to bolster T. Richter's appeal.

99.     Plaintiffs advised Xcentric that all of the postings were false and misleading. Despite this fact, and Xcentric's knowledge thereof, it refused to remove the postings. In fact, part of Xcentric's business model includes never removing posts. This was known by the other Defendants.

100.    Xcentric, in failing to remove the postings, is now the publisher of the content set forth in the postings contained herein.

99.     When Xcentric was asked to remove the postings, they again demanded that the Plaintiffs pay to have the postings removed.

100.     The Defendants knew that by failing to remove the posts it would damage the Plaintiff's business, would damage Plaintiffs' professional reputation in the community and would destroy their future business expectancies/income. This tactic was deliberate and continued existence of the postings was purposefully used to threaten and inject fear upon the Plaintiffs.

101.     The result of Defendants' willful decision to post false and damaging information about the Plaintiffs, and Magedson and Xcentric's refusal to take down the postings is harming and will continue to harm the Plaintiffs' in the following ways, among other things:

   a. Potential and actual loss of patients who read the postings;

   b. Loss of quality employees who read the postings;

   c. Loss of current PPS patients;

   d. Loss of future PPS patients;

   e. Loss of PPS' business opportunities;

   f. PPS loss of profits;

   g. Loss of PPS' goodwill with its patients, the loss of goodwill in the plastic surgery profession, and the loss of goodwill PPS worked to create with its patients and regulatory authorities;

   h. Pitman's loss of past and future income;

   i. Pitman's loss of career, business opportunities and advancement; and

   j. Damage to Pitman's professional reputation.

102.     The combined actions of the Defendants were malicious and done with the intent to harm the Plaintiffs in the Commonwealth of Virginia.  The Ripoff Report postings were directed at the Commonwealth of Virginia, mentioned a city in the Commonwealth of Virginia and targeted both a business and citizen of the Commonwealth of Virginia.

103.     As a direct result of the Defendants actions, the Plaintiffs have lost substantial business, income, and goodwill in their profession.

*The Defendants Actions Continue Today*

104.     The actions of the Defendants have not ceased.  The posts highlighted above (among others) continue to appear prominently in search engine results and on the Ripoff Report.

105.     The Ripoff Report prominently features information on Richter's trial.  In fact, the Ripoff Report's home page has two prominent posts concerning Richter's trial.  One, under the heading "Free Tracy Richter," features a photo of Richter and B. Pitman and states "A Son's Plea: "We are humbly asking for your help in our quest for justice for my mother, Tracey Richter. She was falsely convicted of murder in 2011 for defending her family in a house invasion that occured (sic) in 2001."

106.     Following these and other links, makes locating the posts about the Plaintiffs easier.

107.     The Free Tracey Richter Legal Defense Fund is also accessible through links on the Ripoff Report.  Magedson has contributed to this fund.

## COUNT I
## (TORTIOUS INTERFERENCE)
### (Against all Defendants)

108.     Plaintiffs incorporate, by reference, paragraphs 1 through 107, as if fully set forth herein.

109.     Plaintiffs established or expected to establish a business relationship or expectancy with a probability of a future economic beneficial relationship.  This expectancy, among other things, was with the Plaintiffs' patients for the performance of medical services.

110.     Defendants had knowledge of the Plaintiffs' existing business relationships and expectancies with a probability of a future economic beneficial relationship created by the Plaintiffs' relationship with their customers/patients.

111.     Defendants tortiously interfered with these business relationships and expectancies.

112.     Defendants intentionally and through improper methods, including, but not limited to, defamation, extortion, attempted extortion, conspiracy to commit extortion, witness retaliation and witness tampering prevented the Plaintiffs from performing their existing or expected business, which included future surgeries and other medical procedures.

113.     The actions of the Defendants also caused patients to cancel their surgeries and other medical procedures with the Plaintiffs.

114.     The Plaintiffs suffered damages as a result of Defendants' tortious interference because they were unable to recover expected profits and wages.

115.     Defendants acted willfully, maliciously and/or recklessly in preventing the Plaintiffs from fulfilling their existing or expected business.

116.     The actions of the Defendants injured the Plaintiffs' professional reputations and business goodwill.  The actions of the Defendants also impacted the Plaintiffs ability to generate new income and earn a profit.  Without profits into the business, Pitman, who is inextricably linked to PPS, lost his ability to earn a wage.

117.     As a direct and proximate result of Defendants tortious interference with Plaintiff's business relationships and expectancies with the probability of future economic benefit, the Plaintiffs have suffered and seek compensatory damages and punitive damages.

118.     Based on the Defendants actions, PPS seeks damages for, among other things, loss of current patients, loss of future patients, lost profits, lost goodwill, loss of professional opportunities, and damage to its professional reputation.

119.     Based on the Defendants actions, Pitman seeks damages for, among other things, loss of past and future income, damage to his professional reputation, loss of career, business opportunities and advancement, loss of employee benefits, and loss of past and future pecuniary expenses

**COUNT II**
**(COMMON LAW CONSPIRACY)**
**(Against all Defendants)**

120.     Plaintiff incorporate, by reference, paragraphs 1 through 107, as if fully set forth herein.

121.     Thought the actions outlined herein, Defendants mutually undertook to willfully and maliciously injure the Plaintiffs in their reputation, trade and business.

122.     Defendants, without legal justification, through unlawful means, and in concert with one another, interfered, intimidated, misled, and tampered with the Plaintiffs' current and future customers/patients.

123. The Defendants, acting intentionally, without legal justification and in concert with one another, made arrangements, though unlawful means, to defame, extort, tamper and retaliate against the Plaintiffs.

124. As a direct and proximate result of the conspiracy, Plaintiffs suffered damages associated with the loss of business, injury to their professional reputations and business goodwill. The actions of the Defendants also impacted the Plaintiffs ability to generate new income and earn a profit. Without profits into the business, Pitman, who is inextricably linked to PPS, lost his ability to earn a wage.

125. In conspiring to injure the business of the Plaintiffs though the acts described above, Defendants acted with malice and reckless disregard as to the rights of the Plaintiffs.

126. As a direct and proximate result of Defendants conspiracy, the Plaintiffs have suffered and seek compensatory damages and punitive damages.

127. Based on the Defendants actions, PPS seeks damages for, among other things, loss of current patients, loss of future patients, lost profits, lost goodwill, loss of professional opportunities, and damage to its professional reputation.

128. Based on the Defendants actions, Pitman seeks damages for, among other things, loss of past and future income, damage to his professional reputation, loss of career, business opportunities and advancement, loss of employee benefits, and loss of past and future pecuniary expenses

129.     Plaintiffs also seek an order enjoining the Defendants from benefiting from their unlawful acts by prohibiting them from either direct or indirectly, interfering with the Plaintiffs' business and customers/patients.

### COUNT III
### (STATUTORY BUSINESS CONSPIRACY)
### (Against all Defendants)

130.     Plaintiffs incorporate, by reference, paragraphs 1 through 107, as if fully set forth herein.

131.     In violation of Virginia Code §§ 18.2-499, *et. seq.*, the Defendants intentionally conspired with one another, for the purpose of willfully and maliciously injuring PPS in its business and trade.

132.     As a direct and proximate cause of the conspiracy in violation of Virginia Code §§ 18.2-499, *et. seq.*, Plaintiffs have suffered damages associated with the loss of business, loss of customers and injury to their professional reputations and business goodwill and customers in light of the Defendant's unlawful acts. The actions of the Defendants also impacted the Plaintiffs ability to generate new income and earn a profit. Without profits into the business, Pitman, who is inextricably linked to PPS, lost his ability to earn a wage.

133.     Pitman, as the owner of PPS, is entitled to recover damages pursuant to Virginia Code §§ 18.2-499, *et. Seq*.

134.     As a direct and proximate result of Defendants' conspiracy, PPS has suffered and seek compensatory damages and punitive damages.

135.     Based on the Defendants' actions, PPS seeks damages for, among other things, loss of current patients, loss of future patients, lost profits, lost goodwill, loss of professional opportunities, and damage to its professional reputation.

136.     Based on the Defendants' actions, Pitman seeks damages for, among other things, loss of past and future income, damage to his professional reputation, loss of career, business opportunities and advancement, loss of employee benefits, and loss of past and future pecuniary expenses

137.     Plaintiffs pray that the Defendants be ordered to pay, pursuant to Virginia Code § 18.2-500, treble damages in an amount equal to three times the amount of compensatory damages.

138.     Plaintiffs also pray that the Defendants be ordered to pay, pursuant to Virginia Code § 18.2-500, all costs and attorney's fees incurred in this action.

139.     Plaintiffs also seek an order, pursuant to Virginia Code § 18.2-500, enjoining the Defendants from benefiting from their unlawful acts by prohibiting them from either direct or indirectly, interfering with the Plaintiffs' business and customers.

## COUNT IV
## (DECLARATORY JUDGMENT)
### (Against Defendant Xcentric)

140.     Plaintiffs incorporate, by reference, paragraphs 1 through 107, as if fully set forth herein.

141.     There is an actual and immediate controversy between the Plaintiffs and Xcentric within the meaning of 28 U.S.C § 2201, *et seq.*, as to the parties' respective rights and legal relations in connection with the defamatory information contained on the Ripoff Report described herein and this controversy is concrete and capable of judicial resolution.

142.     Plaintiffs contend that the information contained on the Ripoff Report is false and defamatory and have advised Xcentric of the illegal nature of its posts.

143.     Plaintiffs have repeatedly requested that the Ripoff Report posts be removed given their defamatory nature.

144.     Plaintiffs are entitled to have this Court determine whether Xcentric's acts are unfair and improper.

145.     Plaintiffs are entitled to have this Court determine whether Xcentric's conduct has or will cause damage to the Plaintiffs.

146.     Plaintiffs are entitled to have this Court determine the appropriateness of injunctive relief to restrain ongoing and future violations of the law.

## COUNT V
## (INJUNCTIVE RELIEF)
### (Against Defendant Xcentric)

147.     Plaintiffs incorporate, by reference, paragraphs 1 through 107, as if fully set forth herein.

148.     Defendant Xcentric has failed and refused to remove the disruptive, false and defamatory posts from its website- Ripoff Report.

149.     The continued dissemination of the Ripoff Report posts substantially and unfairly harms the Plaintiffs' business reputation and interferes with their current and potential customers.  If Xcentric's conduct is allowed to continue unchecked, the Plaintiffs' will be irreparably harmed.

150.     Plaintiffs have developed substantial goodwill with their customers/patients.

151.     If Xcentric's conduct continues, Plaintiffs will suffer irreparable harm. Further, Plaintiffs are justifiably concerned that they may lose additional valuable business, patients and other income.

152.     The choice of Xcentric to disregard the Plaintiffs' requests to remove the Ripoff Report posts are harming and will continue to harm the Plaintiffs in the following ways, among other things:

    a.     Potential loss of employees who read the posts;

    b.     Loss of current and future customers/patients; and

    c.     Loss of goodwill in the market place;

153.     The Plaintiffs also suffer irreparable harm because the full extent of damages caused by Xcentric's conduct is ongoing and will continue so long as the Ripoff Report posts remain available to the public.

154.     Plaintiffs are likely to prevail on the merits.

155.     Granting injunctive relief will not disserve Xcentric's interests because its interests can be preserved.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against the Defendants as follows:

1.     That the Plaintiffs be awarded compensatory damages against the Defendants, jointly and severally, in the amount of Fifteen Million Dollars ($15,000,000) pursuant to Counts I and II.

2.     That Plaintiffs be awarded compensatory damages against the Defendants, jointly and severally, in the amount of Fifteen Million Dollars ($15,000,000) pursuant to Count III.

3.     That Plaintiffs be awarded treble damages pursuant to Count III;

4.      That the Plaintiffs be awarded punitive damages against the Defendants, jointly and severally, pursuant to Counts I, II and III in the amount of Three Hundred-Fifty Thousand Dollars ($350,000);

5.      That the Plaintiffs, based on all Counts, be awarded a total of Sixty Million Three Hundred-Fifty Thousand Dollars ($60,350,000) against the Defendants, jointly and severally.

6.      That Plaintiffs be awarded attorneys' fees, costs and expenses against the Defendants pursuant to Count III or as otherwise provided by law;

7.      That Plaintiffs be awarded declaratory relief as requested;

8.      That Xcentric and all persons acting on its behalf or under its direction or control and all successors thereto, be temporarily and permanently enjoined from maintaining the Ripoff Report posts on any website owned and/or controlled by Xcentric;

9.      That the Plaintiffs be awarded pre-and-post judgment interest and costs; and

10.     That the Plaintiffs be awarded such other and further relief as the Court deems proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues in this action that are so triable.

Respectfully submitted,

JOHN M. PITMAN, III, and
PENINSULA PLASTIC SURGERY
CENTER, LTD

By: /s/     Aaron Balla Houchens
        Of Counsel

Aaron B. Houchens, Esq. (VSB #80489)
STANLEY & HOUCHENS, LLC
13508 Booker T. Washington Hwy.
Moneta, Virginia 24121
540-721-6028 (telephone)
540-721-6405 (facsimile)
ahouchens@shg-law.com

Stephen M. Smith, Esq. (VSB #14362)
Seth D. Scott, Esq. (VSB #80907)
David B. Holt, Esq. (VSB #65564)
THE SMITH LAW CENTER
2100 Kecoughtan Road
Hampton, Virginia 23661
757-244-7000 (telephone)
757-245-7740 (facsimile)
ssmith@braininjurylawcenter.com
sscott@attorneys4injured.com
dholt@ attorneys4injured.com

*Counsel for Plaintiffs John M. Pitman, III and Peninsula Plastic Surgery Center, LTD.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of May, 2017, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to the following:

David A. Warrington, Esq.
LeClairRyan
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
Phone: (703) 647-5926
Fax: (703) 647-5966
david.warrington@leclairryan.com
     *Counsel for Defendant Xcentric Ventures, LLC and Edward Magedson*

Jesse R. Binnall, Esq.
Louise T. Gitcheva, Esq.
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, Virginia 22314
Tel: (703) 888-1930
jbinnall@harveybinnall.com  lgitcheva@harveybinnall.com
     *Counsel for Defendants Anna Richter, Bert Pitman and Tracey Richter*

               <u>/s/     Aaron Balla Houchens</u>
               Aaron B. Houchens, Esq. (VSB #80489)
               STANLEY & HOUCHENS, LLC
               13508 Booker T. Washington Hwy.
               Moneta, Virginia 24121
               540-721-6028 (telephone)
               540-721-6405 (facsimile)
               ahouchens@shg-law.com