IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

JOHN M. PITMAN, III, *et al.*,

        Plaintiffs,

v.                                 Civil Action No. 4:16cv179

XCENTRIC VENTURES, LLC., *et al.*,

        Defendants.

## OPINION & ORDER

This matter is before the Court on five (5) related Motions to Dismiss Plaintiffs John M. Pitman III's ("John Pitman's") and Peninsula Plastic Surgery Center's ("PPSC's") (collectively, "Plaintiffs') Complaint. Two Motions address personal jurisdiction: Defendants Xcentric Ventures, LLC's ("Xcentric's") and Edward Magedson's ("Magedson's") Motion to Dismiss for Lack of Jurisdiction, Doc. 37 ("Xcentric/Magedson Jurisdiction Motion"); and Defendant Tracey Richter's Motion to Dismiss for Lack of Jurisdiction, No. 4:17cv12 (hereinafter "Pitman II"), Doc. 10 ("Tracey Richter Jurisdiction Motion"). Three Motions address failure to state a claim: Defendants Xcentric's and Magedson's Motion to Dismiss for Failure to State a Claim, Doc. 39 ("Xcentric/Magedson Claim Motion"); Defendant Tracey Richter's Motion to Dismiss for Failure to State a Claim, Pitman II, Doc. 11 ("Tracey Richter's Claim Motion"); and Defendants Anna Richter and Bert Pitman's Motion to Dismiss for Failure to State a Claim, Doc. 59 ("Anna Richter and Bert Pitman's Claim Motion"). For the reasons stated herein, the Court **DENIED** the Jurisdiction Motions and **SUSTAINED** the Claim Motions, **DISMISSING** the Complaint **WITH LEAVE TO AMEND** within eleven (11) days of the date of the hearing on these Motions.

# I. BACKGROUND

## A. Factual Allegations[1]

This action arises from postings on the website Ripoff Report alleging negative facts about Plaintiffs John Pitman and PPSC. See generally Doc. 1, Ex. A ("Compl."). Ripoff Report is a website run by Defendant Xcentric and created by Magedson. Id. ¶¶ 11, 13, 16. It allows anonymous posting and uses coding and search engine optimization to cause its pages to appear near the top of search engine results. Id. ¶¶ 21–22. It also pays for some of the content it posts. Id. ¶ 23.

The facts culminating in the posts on Ripoff Report start with Plaintiff John Pitman's and Defendant Tracey Richter's marriage on August 14, 1988. Id. ¶ 26. They had one child, Defendant Bert Pitman, who was born on February 1, 1990. Id. They separated in June 1992 and engaged in approximately six (6) years of contentious divorce proceedings. Id. After the divorce, Defendant Tracey Richter met and subsequently married Michael Roberts ("Roberts") in 1996.[2] Id. ¶ 27.

In 1998, Defendant Tracey Richter and Roberts moved to Early, Iowa, where Defendant Tracey Richter befriended her neighbor Dustin Wehde ("Wehde"). Id. ¶ 28. In 2000, Roberts was jailed on domestic violence charges. Id. ¶ 29. Around December 2001, when Defendants Tracey Richter and Bert Pitman were at home, Defendant Tracey Richter fired eleven shots at Wehde using two different weapons, nine of which hit his body. Id. ¶ 30. Defendant Tracey Richter claimed she was acting in self-defense. Id. ¶ 31. A journal found in Wehde's car, which

---

[1] "In considering a motion to dismiss, [the Court] accept[s] as true all well-pleaded allegations and view[s] the complaint in the light most favorable to the plaintiff." Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005) (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993)). The Court cautions, however, that the facts alleged by Plaintiffs are recited here for the limited purpose of deciding the instant Motion to Dismiss. The recited facts are not factual findings upon which the parties may rely for any other issue in this proceeding.

[2] The Complaint does not clarify how a marriage after a six (6) year divorce proceeding occurred four (4) years after the separation.

appeared to be Wehde's journal, indicated that he was hired by Plaintiff John Pitman and his attorney to "stalk, harass and ultimately murder" Defendants Tracey Richter and Bert Pitman. Id. Plaintiff John Pitman was never arrested or charged with any connection to the murder. Id. ¶ 33. Approximately two (2) years after the murder, Wehde's estate filed a civil action against Defendant Tracey Richter, but that case was ultimately dismissed. Id. ¶ 36. In 2004, Roberts and Defendant Tracey Richter filed for divorce. Id.

In November 2010, a new county attorney decided to investigate the death of Wehde. Id. ¶ 40. Defendant Tracey Richter was arrested on July 27, 2011. Id. ¶ 41. Prior to the start of Defendant Tracey Richter's trial, Defendant Darren Meade ("Meade") became interested in the trial. Id. ¶ 45. He was aware of her because of a prior contentious relationship with Roberts. Id. At the trial, various witnesses testified against Defendant Tracey Richter, including her ex-husband, Plaintiff John Pitman. Id. ¶ 47. On November 7, 2011, a jury found Defendant Tracey Richter guilty of murdering Wehde. Id.

In the days following Defendant Tracey Richter's conviction, Defendant Bert Pitman, Defendant Meade, and Defendant Tracey Richter's mother, Defendant Anna Richter, began discussing how to overturn the conviction. Id. ¶ 48. All four of those Defendants began planning in December 2012 to investigate witnesses and have those witnesses recant their trial testimony in order to overturn Defendant Tracey Richter's conviction. Id. ¶ 51. Defendant Meade was an employee or agent of Defendant Xcentric, and he used the website Ripoff Report to post stories about the witnesses in Defendant Tracey Richter's murder trial. Id. ¶ 52. Defendant Bert Pitman contacted employees of Plaintiff PPSC as well as Plaintiff John Pitman's ex-girlfriends. Id. ¶¶ 54, 57. The other three Defendants in this plan also began gathering information regarding Plaintiffs John Pitman and PPSC. Id. ¶¶ 53–57. Defendant Meade also

gathered information regarding Roberts. Id. ¶ 56.

Defendant Meade told Defendant Magedson about Defendant Tracey Richter's trial, and Defendant Xcentric employed Defendant Meade in an attempt to exonerate Defendant Tracey Richter. Id. ¶ 58. Defendant Magedson also asked Defendant Anna Richter for information about Plaintiff John Pitman and others to post on Ripoff Report. Id. ¶ 59. Defendant Anna Richter sent weekly packages of information concerning Defendant Tracey Richter and her trial to Defendants Meade, Magedson, and Xcentric. Id. ¶ 60. Defendants Xcentric and Magedson were interested in this story because they saw an opportunity to post the stories and then charge Plaintiffs substantial fees to edit or remove the posts. Id. ¶ 62.

After Richter's conviction, several posts appeared on Ripoff Report over time regarding her trial, at least some of which were authored by Defendant Meade. Id. ¶ 63. Defendant Meade used information from Defendants Tracey Richter, Anna Richter, and Bert Pitman to compose his online posts, and Defendants Xcentric and Magedson paid him for those posts. Id. ¶ 65. On September 11, 2012, Defendant Meade posted a complaint outlining his own version of the facts of Wehde's murder. Id. ¶ 64. On September 21, 2012, he posted a complaint which had a title alleging that there was a "Bounty Shared Amongst Prosecution Witnesses" at Defendant Tracey Richter's murder trial. Id.

The posts on Ripoff Report began specifically targeting Plaintiffs after the Court of Appeals of Iowa affirmed Defendant Tracey Richter's murder conviction on January 9, 2013. Id. ¶ 67. Defendant Tracey Richter sought to target Plaintiff John Pitman with complaints in retaliation for his refusal to recant his testimony in her murder trial. Id. ¶ 68.

On January 21, 2013, a post appeared on Ripoff Report with the following title:

Dr. John Pitman III, MD Peninsula Plastic Surgery Center, Pitman Surgical Associates, Estranged Ex Husband Key Witness Arrested by 6 Armed Officers at

4

Plastic Surgery Practice, United States Army Col Office Locations: Williamsburg, Hayes, Newport News Embarrassment to the prosecution knowingly lies in court, deadbeat hack plastic surgeon, United States Army Reserve Cornel Lisa Pitman Williams, Virginia

Id. ¶ 69. The text of that post stated that:

John Pitman, intentionally withheld information from prosecutors that he was near bankrutcy (sic) when he struck a pay-to-testify deal in the Tracey Richter murder trial. Pitman, notorious for his on-going drug use and his pay-for-play with local strippers had his car repossessed; and continued to provide boob jobs for his pole dancing friends.

Id. ¶ 70. The post included a picture of Plaintiff John Pitman, and several updates to the post discussed various lawsuits in which he was allegedly involved. Id. ¶ 71. One update to that post was titled "Dr. John Pitman and Michael Roberts, Vegas orgies, she/he and he/he twister, doctor prescribing pain pills for sex fueled nights." Id. ¶ 72. The text of that update referred to him as "Dr. Boob Job" and alleged that he was "soliciting prostitution for plastic surgery." Id.

A second post also originated on January 21, 2013. This post was titled:

Dr. John Pitman cheats on wife Lisa Pitman with rapper Lachesis. Dr John Pitman broke with multiple tax IRS tax liens, finances video for Lachesis which has a brutal home invasion murder similar to th (sic) husband cheats on dead fish wife Lisa Pitman, Allisan Tucker, Tracey Richter murder trial, sac county iowa Williamsburg, Virginia.

Id. ¶ 73.

A third post of unknown date also addressed Plaintiff John Pitman. The post was titled:

Tracey Richter falsely convicted. Ben Smith Sac County Iowa Michael Roberts Rexxfield Exposed Audio recording proves Prosecutor's friend Michael Roberts motive and opportunity, confesses he claimed Dr. John Pitman baby raper. Sydney Morning Herald disgrace Sac City Iowa

Id. ¶ 74. Plaintiffs also allege upon information and belief that there were additional posts about Plaintiffs on Ripoff Report beyond these three posts. Id. ¶ 79.

Plaintiffs had a successful plastic surgery business that was growing before these

5

complaints were posted online. Id. ¶¶ 80–88. They allege that these posts were intended to harm their future business. Id. ¶ 89. They further allege that as a result of these posts, they lost existing clients, lost potential clients who had paid deposits for surgeries, and experienced a decline in new business. Id. ¶ 90.

On August 29, 2013, an employee of Defendant Xcentric contacted Plaintiffs, advising that Defendant Xcentric would remove the posts about Plaintiffs from Ripoff Report if they made two (2) payments of $10,000 followed by monthly payments in perpetuity. Id. ¶¶ 91–93. This was one of multiple attempts by Defendant Xcentric to obtain money from Plaintiffs. Id. ¶ 94. Plaintiffs advised Defendant Xcentric that the posts were false, but Defendant Xcentric refused to remove the posts without payment and continued to demand payment. Id. ¶¶ 95–97.

Defendant Xcentric continues to display these posts on Ripoff Report. Id. ¶ 101. It also has a post on its front page entitled "Free Tracey Richter" that facilitates finding the posts about Plaintiffs. Id. ¶¶ 102–03. This front page post includes a link to the Free Tracey Richter Legal Defense Fund, which counts Defendant Magedson among its donors. Id. ¶ 104.

B.    **Procedural History**

Plaintiffs filed suit in the Circuit Court for Williamsburg/James City County, Virginia on October 6, 2016. See generally Compl. Defendant Xcentric was served on November 17, 2016, and timely noticed removal on December 7, 2016. See Doc. 1. Defendant Magedson was served on January 12, 2017, and filed his own Notice of Removal on February 10, 2017, despite the case already being removed to federal court. See Pitman II, Doc. 1. The ensuing procedural difficulties and additional procedural errors are discussed at length in this Court's prior Order. See Doc. 57.

Defendants Magedson and Xcentric filed Motions to Dismiss for lack of jurisdiction and

for failure to state a claim in both dockets on February 28, 2017. Docs 37, 39; Pitman II, Docs. 5, 7. That same day, Defendants Tracey Richter, Bert Pitman, and Anna Richter all filed motions to dismiss in the other docket that they did not have leave to file in this docket. See Pitman II, Docs. 10–12, 14.

This Court consolidated the cases on March 2, 2017. Doc. 41. Plaintiffs filed their opposition to Xcentric and Magedson's Motions to Dismiss on March 14, 2017. Doc. 47, 49. Plaintiffs also filed their opposition to Tracey Richter's Motions to Dismiss on March 14, 2017 in this docket. Doc. 48. Xcentric and Magedson filed their replies on March 20, 2017. Docs. 54–55. Tracey Richter filed her reply in this docket on March 20, 2017. Doc. 53. On March 22, 2017, the Court DEEMED Tracey Richter's Motions to Dismiss filed in the other docket, Pitman II, Docs. 10–12, timely filed in this docket. See Doc. 57.

At a hearing on March 21, 2017, Defendants Anna Richter and Bert Pitman withdrew their Motion to Dismiss in the other docket (Pitman II, Doc. 14) and sought leave to file a new Motion to Dismiss in this docket. Doc. 56. The Court GRANTED leave to file a new Motion to Dismiss within eleven (11) days. Id. Defendants Anna Richter and Bert Pitman filed their Motion to Dismiss on March 31, 2017. Doc. 59. Plaintiffs responded on April 13, 2017. Doc. 61. Defendants Anna Richter and Bert Pitman replied on April 19, 2017. Doc. 62. The Final Pretrial Conference is scheduled for November 20, 2017, and trial is scheduled for December 5, 2017. See Doc. 58.

## II.     LEGAL STANDARDS

### A.     Rule 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), a court may dismiss a defendant from an action for lack of personal jurisdiction. When the court addresses the question of personal

jurisdiction "on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). In considering a challenge to personal jurisdiction, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Id.

**B.    Rule 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss tests the sufficiency of a complaint; it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Venkatraman, 417 F.3d at 420 ("In considering a motion to dismiss, we accept as true all well-pleaded allegations and view the complaint [or counterclaim] in the light most favorable to the plaintiff [or counterclaim plaintiff]") (citing Mylan Labs., 7 F.3d at 1134). A complaint establishes facial plausibility "once the factual content of a complaint allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 678). Therefore, the complaint need not include "detailed factual allegations" as long as it pleads "sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct." Id. Although a court must accept as true all

well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

In deciding the motion, a court may consider the facts alleged on the face of the complaint as well as "'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" Moore v. Flagstar Bank, 6 F. Supp. 2d 496, 500 (E.D. Va. 1997) (quoting 5A Charles A. Wright & Arthur R. Miller, et al., Fed. Prac. & Proc. Civ. § 1357 (1990)). The court may look to documents attached to the complaint and those incorporated by reference without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. See Pueschel v. United States, 369 F.3d 345, 353 n.3 (4th Cir. 2004) (citations omitted).

**C.    Rule 12(c)**

A party who fails to file a motion under Rule 12(b)(6) before its answer may still assert the same defense through a motion under Rule 12(c). See Fed. R. Civ. P. 12(h)(2). When reviewing a motion under Rule 12(c) for failure to state a claim upon which relief can be granted, a court applies the same standard as it would apply for a motion under Rule 12(b)(6). Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).

**D.    Rule 12(i)**

A party who raises a defense under Rule 12(b) in its responsive pleading may move for a hearing and decision on that defense in advance of trial. See Fed. R. Civ. P. 12(i). The Court retains discretion to hear the defense before trial, even if the motion occurred after the responsive pleading. See 5C Charles A. Wright & Arthur R. Miller, et al., Fed. Prac. & Proc. Civ. § 1361 (3d ed. 2017).

# III. ANALYSIS

## A. Personal Jurisdiction

Three Defendants contest personal jurisdiction: Xcentric, Magedson, and Tracey Richter. To determine whether it has personal jurisdiction over the defendant, the Court must resolve two issues: (A) whether the action falls within the ambit of Virginia's long-arm statute, Va. Code Ann. § 8.01–328.1, and (B) whether the due process clause of the Fourteenth Amendment permits jurisdiction. ESAB Group v. Centricut, 126 F.3d 617, 622 (4th Cir. 1997). "Because Virginia's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause, the statutory inquiry merges with the constitutional inquiry." See Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 277 (4th Cir. 2009). Nevertheless, a defendant could satisfy the constitutional test but not satisfy a particular provision of the Virginia long-arm statute, and the merged analysis must consider the relevant provisions. See New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294 & n. 6 (4th Cir. 2005) (citations omitted).

Under the due process analysis, the Supreme Court has drawn a distinction between "specific" jurisdiction and "general" jurisdiction. To establish specific jurisdiction, a plaintiff must demonstrate that the defendant has "purposefully directed" his activities at residents of the forum, Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984), and that the alleged injuries "arise out of or relate to" those activities. Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414 (1984). If the cause of action does not arise out of or relate to the defendant's contacts with the forum state, the plaintiff must demonstrate that the defendant's contacts with the forum are "continuous and systematic" so as to support the exercise of general personal jurisdiction. Helicopteros, 466 U.S. at 415–16.

Plaintiffs do not argue general jurisdiction in this case, and thus the only issue below is whether this Court has specific jurisdiction over Defendants. When determining specific jurisdiction, a court must consider "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State, (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002).

In ALS Scan, the Fourth Circuit considered, as a question of first impression, "whether a person electronically transmitting or enabling the transmission of information via the Internet to [a state], causing injury there, subjects the person to the jurisdiction of a Court in [a state]." Id. In deciding the issue, the Fourth Circuit adopted the model developed in Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119 (W.D. Pa. 1997). Under this model, "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." Zippo, 952 F.Supp. at 1124. The Fourth Circuit adopted and adapted the Zippo model, finding personal jurisdiction when a party "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." ALS Scan, 293 F.3d at 714.

### i.    Xcentric

As a preliminary matter, Defendant Xcentric filed its Jurisdiction Motion seventy-five (75) days after it filed an Answer. Compare Doc. 37 (filed 02/28/2017) with Doc. 5 (filed 12/15/2016). Rule 12 requires Parties to make 12(b) motions before filing a responsible

pleading. See Fed. R. Civ. P. 12(b). Thus, the Court must first address whether it can properly consider the Xcentric/Magedson Jurisdiction Motion as to Xcentric.

A court may consider an untimely motion under Rule 12(b)(1) as a motion under Rule 12(i) for a preliminary hearing if that defense was preserved in the Answer. See Fed. R. Civ. P. 12(i); Branson v. Am. Int'l Indus., No. 1:15cv73, 2016 WL 3190222, at *4 (M.D.N.C. June 7, 2016) (resolving an untimely Rule 12(b)(1) motion under Rule 12(i)); see also Porsche Cars N. Am., Inc. v. Porsche.net, 302 F.3d 248, 256 (4th Cir. 2002) ("personal jurisdiction is indubitably waived absent timely objection"). The Parties dispute whether Defendant Xcentric waived personal jurisdiction by insufficiently objecting in the Answer. Compare Doc. 47 at 17–19 with Doc. 55 at 6. In its Answer, Defendant Xcentric responded to an allegation of personal jurisdiction as follows: "Answering Paragraph 14, denies that the answering defendant is subject to jurisdiction in this Court, and denies the remaining averments of paragraph 14." Doc. 5 ¶ 14. Plaintiffs argue that because Defendant Xcentric did not assert the lack of personal jurisdiction as part of its affirmative defenses, it has waived that defense. Doc. 47 at 18. Plaintiffs cite JTH Tax, Inc. v. Houle, No. 2:11cv66, 2011 WL 3290378, at * 3 (E.D. Va. 2011) for the proposition that a general objection to personal jurisdiction is insufficient to preserve that defense. Id. Defendant Xcentric replies that the waiver argument is one of form over substance because it has consistently objected to personal jurisdiction, both in the Answer and in its other filings. Doc. 55 at 6. Contrary to Plaintiffs' argument, JTH Tax is inapposite, as it involved an objection that "does not differentiate between personal jurisdiction and subject matter jurisdiction," 2011 WL 3290378, at *3, which is plainly more generic than the objection at issue in this case. The Answer should have included the defense in the Affirmative Defenses section, but in light of Defendant Xcentric's consistent objection to personal jurisdiction, it would be an unnecessarily

severe sanction to subject it to personal jurisdiction for failing to copy the objection under all relevant headings in the Answer. Thus, the Court **FOUND** that Defendant Xcentric's objection in the Answer is sufficient to preserve the defense of personal jurisdiction. The Court also **CONSTRUES** the Xcentric/Magedson Jurisdiction Motion, Doc. 37, as a Motion under Rule 12(i) for purposes of Defendant Xcentric.

a.     **Xcentric's Direct Contacts**

In this case, Plaintiffs assert jurisdiction under Virginia's long-arm statute pursuant to Va. Code Ann. § 8.01-328.1(A)(3), which states: "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's: . . . Causing tortious injury by an act or omission in this Commonwealth." This statutory provision requires that the defendant was physically present in Virginia for at least one relevant act or omission. See Cent. Va. Aviation, Inc. v. N. Am. Flight Servs., Inc., 23 F. Supp. 3d 625, 629 (E.D. Va. 2014); People Exp. Airlines, Inc. v. 200 Kelsey Assocs., LLC, 922 F. Supp. 2d 536, 545 (E.D. Va. 2013); Commercial Metals Co. v. Compania Espanola de Laminacion S.L., 749 F. Supp. 2d 438, 445 (E.D. Va. 2010).

Plaintiffs' Complaint fails to demonstrate that Xcentric's own contracts subject it to personal jurisdiction under that provision of the Virginia long-arm statute. While the ALS Scan factors provide a fairly broad assertion of jurisdiction, they are most commonly used in cases where the plaintiff asserted jurisdiction pursuant to Va. Code Ann. § 8.01-328.1(A)(1), which addresses "[t]ransacting any business" in Virginia. See, e.g., DeCusati v. Reiss Eng'g, Inc., No. 3:15cv204, 2015 WL 4622494, at *3 (E.D. Va. July 30, 2015); Hirsch v. Johnson, No. 1:14cv332, 2015 WL 3537173, at *5 (E.D. Va. June 4, 2015); Match.Com, L.L.C. v. Fiesta Catering Int'l, Inc., No. 1:12cv363, 2013 WL 428056, at *3 (E.D. Va. Jan. 31, 2013); English

Boiler & Tube, Inc. v. Glex Inc., No. 3:12cv88, 2012 WL 2131895, at *4 (E.D. Va. June 12, 2012). The provision pled by Plaintiffs here has a narrower application, as it requires physical presence in Virginia for at least one relevant act or omission in a pled tort. Commercial Metals Co., 749 F. Supp. 2d at 445; see also Doc. 28 at 4–5 (arguing that point). Plaintiffs only pled that Xcentric paid for the collection of information about Plaintiffs, contacted Plaintiffs in Virginia over the telephone to extort funds, and posted defamatory remarks online that mentioned Williamsburg, Virginia and were available to read in Virginia. Compl. ¶¶ 58, 65, 69–75, 91–97; see also Doc. 47 at 6–8. While phone calls to Virginia may qualify as contacts under Va. Code Ann. § 8.01-328.1(A)(1), they are typically entitled to minimal weight in assessing minimum contacts under that statutory provision. See, e.g., KMLLC Media, LLC v. Telemetry, Inc., No. 1:15cv432, 2015 WL 6506308, at *10 (E.D. Va. Oct. 27, 2015). Virginia courts have generally required some connection in addition to the phone calls, such as the completion of a contract in Virginia. See, e.g., Nan Ya Plastics Corp. U.S.A. v. DeSantis, 237 Va. 255, 260–61 (1989). Under the provision pled by Plaintiffs, phone calls do not hold any weight in minimum contacts analysis in the absence of facts showing an act or omission in Virginia. As Defendants Xcentric and Magedson correctly observe, the fact that the injury occurred in Virginia also does not affect the analysis under that provision of Virginia's long-arm statute. Doc. 55 at 3; FireClean, LLC v. Tuohy, No. 1:16cv0294, 2016 WL 3952093, at *7 (E.D. Va. July 21, 2016) ("[T]he Supreme Court and the Fourth Circuit have brushed back attempts to vest jurisdiction in a State based entirely or predominantly on the locus of the plaintiff's injury.") Thus, based on the pleadings alone, Plaintiffs fail to demonstrate personal jurisdiction based on direct contacts.

Nevertheless, the Court is not restricted to considering the provisions of the long-arm statute pled by Plaintiffs, as personal jurisdiction is an issue for both the Court and the Parties to

address. See, e.g., Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir. 2004) (explaining that the court must determine whether it has personal jurisdiction). The Court **FOUND** that extortion via phone calls along with the rest of the conspiracy pled here would satisfy the additional connection required for personal jurisdiction under the long-arm statute provisions regarding transacting business in Virginia.[3] Accordingly, the Court **FOUND** that Plaintiffs made a prima facie showing of personal jurisdiction based on direct contacts.

**b.    Co-conspirator Contacts**

Even if the Court did not FIND personal jurisdiction under direct contacts, Plaintiffs still demonstrated personal jurisdiction under the Virginia long-arm statute over Defendant Xcentric through the acts of co-conspirators.  This District has found several times that under Virginia law, a defendant who is part of a conspiracy is subject to jurisdiction where its co-conspirators performed overt acts in furtherance of the conspiracy if that defendant knew or should have known that a co-conspirator would perform those acts. See, e.g., Noble Sec., Inc. v. MIZ Eng'g, Ltd., 611 F. Supp. 2d 513, 539–40 (E.D. Va. 2009); Provident Pharm., Inc. v. Amneal Pharm., LLC, No. 3:08cv393, 2008 WL 4911232, at *3 (E.D. Va. Nov. 13, 2008); Decision Insights, Inc. v. Quillen, No. 05cv335, 2005 WL 2757930, at *6 (E.D. Va. Oct. 21, 2005); Am. Online, Inc. v. Ambro Enterprises, No. 04cv1498, 2005 WL 2218433, at *3 (E.D. Va. Sept. 8, 2005); Verizon Online Servs., Inc. v. Ralsky, 203 F. Supp. 2d 601, 622 (E.D. Va. 2002).  This exercise of jurisdiction is proper even when the nonresident co-conspirator's only connection with Virginia is the acts of one of its co-conspirators. Am. Online, Inc., 2005 WL 2218433, at *3 n. 1.

---

[3] The Court also observes that other courts in this Circuit have found a prima facie showing of personal jurisdiction over this particular Defendant under the Fourth Circuit's ALS Scan test and a similar long-arm statute without even requiring the additional connection that this Court discusses. See, e.g., Rist v. Xcentric Ventures, LLC, No. 12cv3660, 2013 WL 2946762, at *7–8 (D. Md. June 12, 2013).

In this case, the Complaint alleges an agreement between Defendants Tracey Richter, Bert Pitman, Anna Richter, and Meade. Compl. ¶ 51. The purpose of the conspiracy was "to investigate witnesses and to attempt to have those witnesses recant their trial testimony," and the conspiracy was "especially focused on Pitman." Id. Defendant Meade was also an agent or employee of Defendant Xcentric during the activities alleged in the Complaint. Id. ¶ 12. Furthermore, his involvement in the conspiracy was as an agent or employee of Defendant Xcentric, as he was paid by Xcentric for his activities in furtherance of the conspiracy. Id. ¶ 52, 58, 63, 75. Virginia law holds companies liable under respondeat superior for the intentionally tortious actions of their employees performed within the scope of employment. See, e.g., Newport News Indus. v. Dynamic Testing, Inc., 130 F. Supp. 2d 745, 754 & n. 8 (E.D. Va. 2001). Thus, based on the alleged facts, it appears that Defendant Xcentric is properly viewed as part of the conspiracy through Defendant Meade.

The Parties then dispute whether any actions by Defendant Bert Pitman were sufficient contacts in their own right to impute personal jurisdiction to his co-conspirators. Plaintiffs argue that Defendant Bert Pitman performed his acts in furtherance of the conspiracy entirely within Virginia. Doc. 47 at 16. The Complaint alleges that Defendant Bert Pitman was a resident of Virginia at the time of the alleged acts and at the time of the filing of the Complaint. Compl. ¶ 10. It further alleges that he contacted Plaintiffs' employees, contacted Plaintiff John Pitman's ex-girlfriends, and transmitted what he learned to his co-conspirators. Id. ¶¶ 54, 57, 60. Defendant Xcentric essentially responds that the actions by Defendant Bert Pitman were phone calls that are insufficient for personal jurisdiction. Doc. 55 at 5. It also argued at the hearing that Defendant Bert Pitman did not act in Virginia at all.

This argument is a close call because of the limited pleading in the Complaint. The Complaint initially alleged that Defendant Bert Pitman was a Virginia resident during the alleged acts and at the time of filing of the Complaint. Compl. ¶ 10. In the dispute regarding removal of this case to federal court based on diversity jurisdiction, the Court FOUND that it has diversity jurisdiction. See Docs. 56–57. Plaintiffs have never conceded that Defendant Bert Pitman was in Iowa during all of the relevant actions, though, nor has the Court made any such finding. Thus, reading the Complaint in the light most favorable to Plaintiff requires reading the Complaint as alleging all of his actions in Virginia. Beyond that defect, the Complaint also fails to allege whether Defendant Bert Pitman's communications in furtherance of the conspiracy were phone calls, in-person contacts, or some other method. See Compl. ¶¶ 54, 57, 60. The case cited by Defendant Xcentric only discusses the effects of phone calls from out-of-state residents and does not address the question of phone calls by an in-state resident, see FireClean, LLC, 2016 WL 3952093, at *5–7, let alone other forms of communication, rendering it of questionable utility at this stage. While there is a factual question of whether Defendant Bert Pitman committed substantial acts in Virginia in furtherance of the conspiracy, that issue is not properly resolved on a Motion concerning prima facie showings of jurisdiction. Once the Complaint is read favorably toward Plaintiffs, the analysis is clearer, as Defendant Meade knew that Defendant Bert Pitman would perform those actions in Virginia, see Compl. ¶¶ 51–62, and his actions are imputed to Defendant Xcentric as discussed above. Thus, the Court FOUND that Plaintiffs made a prima facie showing of personal jurisdiction under the Virginia long-arm statute over Defendant Xcentric as a participant in a conspiracy with overt acts performed in Virginia. Because the Court GRANTED Plaintiffs LEAVE TO AMEND, the Court also notes

17

that Plaintiffs should expand the extremely limited pleading regarding Bert Pitman's activities in Virginia.

c.    **Constitutional Inquiry**

A defendant who meets the test for co-conspirator personal jurisdiction under the Virginia long-arm statute has purposefully availed himself of Virginia. Verizon Online Servs., Inc., 203 F. Supp. 2d at 615–20. The cause of action in this case also arises at least in part from the conspiracy's activities in Virginia, as Defendant Bert Pitman's contacts with employees and ex-girlfriends in Virginia were in furtherance of the conspiracy against Plaintiffs. Compl. ¶¶ 53–60. Thus, the remaining question is whether the exercise of personal jurisdiction over Defendant Xcentric is constitutionally reasonable. ALS Scan, 293 F.3d at 712. Factors involved in assessing whether personal jurisdiction is constitutionally reasonably include: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985) (citations and internal quotation marks omitted).

Defendant Xcentric will undoubtedly incur some burden in defending an action outside its home state. Virginia has a strong interest in adjudicating the dispute, though, because it involves a Virginia plaintiff and Virginia law. Plaintiffs' interest here favors obtaining relief in a court close to where the affected business resides. Efficient resolution of a multi-state conspiracy is best accomplished by adjudicating the conspiracy in a court with experience with the applicable state law. The several States also have a shared interest in defending their residents against tortious conspiracies that involve their residents as both perpetrators and

victims. On balance, most of the factors favor finding that personal jurisdiction is constitutionally reasonable, and therefore the Court **FOUND** that the exercise of personal jurisdiction over Defendant Xcentric is constitutionally reasonable.

### ii. *Magedson*

Beyond the waiver issue regarding Defendant Xcentric, no Party argues personal jurisdiction over Defendant Magedson apart from personal jurisdiction over Defendant Xcentric. See generally Docs. 38, 47, 55. Defendants Xcentric and Magedson observe that Plaintiffs must prove jurisdiction as to each of them, see Doc. 55 at 3 n. 2, but they otherwise argue jointly about whether jurisdiction exists. This joint defense is sensible in the Fourth Circuit, as corporate officers and employees acting in their official capacity are subject to personal jurisdiction in any district where the corporation is subject to personal jurisdiction if "the forum state's long-arm statute is coextensive with the full reach of due process." Pittsburgh Terminal Corp. v. Mid Allegheny Corp., 831 F.2d 522, 525 (4th Cir. 1987). As discussed above, Virginia's long-arm statute is coextensive with the full reach of due process. In addition, the Complaint alleges that Magedson acted in his official capacity at Xcentric. See, e.g., Compl. ¶¶ 75, 93. Since Magedson is part of the alleged acts as an officer or employee of Defendant Xcentric, the analysis regarding Defendant Xcentric applies equally to Defendant Magedson. Thus, the Court **FOUND** that Plaintiffs made a prima facie showing of personal jurisdiction over direct contacts for Defendant Magedson and **FOUND** that such jurisdiction is constitutionally reasonable.

### iii. *Tracey Richter*

**a.    Tracey Richter's Direct Contacts**

Plaintiffs do not contend that Tracey Richter's direct contacts are sufficient to subject her to personal jurisdiction. See generally Doc. 48. Thus, the Court need not address this issue.

**b.    Co-Conspirator Jurisdiction**

Plaintiffs contend that Defendant Tracey Richter is subject to personal jurisdiction under the Virginia long-arm statute under a co-conspirator theory of personal jurisdiction. Doc. 48 at 3. There is no dispute that the alleged facts state that she was part of the conspiracy and that she asked Defendant Bert Pitman to act in furtherance of the conspiracy. Compl. ¶¶ 51, 54. Instead, Defendant Tracey Richter argues that Defendant Bert Pitman was not a Virginia resident during the actions alleged in the Complaint and did not act in Virginia. Doc. 13 at 9. Plaintiffs completely disagree, arguing that he acted in Virginia. Doc. 48 at 3. As discussed previously, the Complaint initially alleged that Defendant Bert Pitman was a Virginia resident during the alleged acts and at the time of filing of the Complaint. Compl. ¶ 10. Thus, on the face of the Complaint, Defendant Bert Pitman acted in Virginia, and his actions may be imputed to his co-conspirator Defendant Tracey Richter. Thus, the Court **FOUND** that it has personal jurisdiction over Defendant Tracey Richter under the Virginia long-arm statute as a participant in a conspiracy with overt acts performed in Virginia.

**c.    Constitutional Inquiry**

As discussed above, a defendant who meets the test for co-conspirator personal jurisdiction under the Virginia long-arm statute has purposefully availed himself of Virginia. See supra Part III.A.i.c. Also, because the Court FOUND on the face of the Complaint that Defendant Bert Pitman's activities in furtherance of the conspiracy occurred in Virginia, the cause of action in this case arose at least in part from the conspiracy's activities in Virginia. Thus, the remaining question again is whether the exercise of personal jurisdiction over the defendant is constitutionally reasonable. ALS Scan, 293 F.3d at 712.

An individual defendant now residing in Iowa may suffer greater inconvenience in a case in Virginia than does a corporation residing outside of Virginia. Nevertheless, the remaining factors of constitutional reasonableness remain the same as discussed above for Defendant Xcentric. See supra Part III.A.i.c (discussing the remaining factors). Thus, the Court **FOUND** that, on balance, the exercise of personal jurisdiction over Defendant Tracey Richter is constitutionally reasonable.

#### iv.    Conclusion

Thus, the Court **FOUND** that Plaintiffs made a prima facie showing of personal jurisdiction and **DENIED** the Xcentric/Magedson Jurisdiction Motion, Doc. 37, and the Tracey Richter Jurisdiction Motion, Pitman II, Doc. 10. The Court also reminded the Parties that jurisdiction may be revisited at any time should evidence show that the pled facts supporting personal jurisdiction are false.

**B.    Failure to State a Claim**

All Defendants move to dismiss the complaint for failure to state a claim on essentially the same grounds: (1) that Plaintiffs' tortious interference with business expectancy claim is an improper attempt to seek defamation damages under another tort, and (2) that Plaintiffs fail to allege facts to support all of the elements of tortious interference with business expectancy. Doc. 40 at 3–8; Pitman II, Doc 13 at 9–16; Doc 60 at 4–12. Defendants also all argue that the conspiracy claims fail if the underlying tort fails. Doc. 40 at 8 n. 4; Pitman II, Doc 13 at 16–18; Doc 60 at 12–15.[4] The remaining "claims" in the Complaint, for declaratory judgment and for

---

[4] Plaintiffs argue that the conspiracy claims have a different statute of limitations than the underlying tort, allowing the claims to proceed with defamation rather than tortious interference as the relevant tort, but that argument is legal error. See infra Part III.B.iii.

injunctive relief against Defendant Xcentric, are remedies, not actual claims.[5]  Thus, the disposition of all three Motions depends on how the Court rules on the claim for tortious interference with business expectancy.

As a preliminary matter, Defendant Xcentric filed its Claim Motion seventy-five (75) days after it filed an Answer, just as it filed its Jurisdiction Motion after its Answer. Compare Doc. 39 (filed 02/28/2017) with Doc. 5 (filed 12/15/2016).  Thus, the Court must also address whether it can properly consider the Xcentric/Magedson Claim Motion as to Xcentric.

A court may construe an untimely motion under Rule 12(b)(6) as a motion under Rule 12(c). Walker v. Kelly, 589 F.3d 127, 139 (4th Cir. 2009).  It applies the same standard in reviewing the motion under Rule 12(c) as it would apply under Rule 12(b)(6). See id.; Edwards, 178 F.3d at 243.  Because such construal would make no practical difference in the Court's decision on Defendant Xcentric's Claim Motion, the Court **CONSTRUES** the Xcentric/Magedson Claim Motion, Doc. 39, as a Motion under Rule 12(c) for purposes of Defendant Xcentric.

#### i.     Whether Count I is Subject to the Defamation Statute of Limitations

Defendants argue that Plaintiffs' tortious interference claim is an artfully pled defamation claim attempting to avoid the one (1) year statute of limitations on defamation claims. See Doc. 40 at 3–6; Pitman II, Doc 13 at 9–12; Doc 60 at 4–7.  The Supreme Court has held that a plaintiff cannot recover tort damages for intentional infliction of emotional distress when the claim at issue is actually a defamation claim. See Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50 (1988).  The Fourth Circuit reads that case to foreclose all attempts to "recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment)

---

[5] Defendant Xcentric also argues that declaratory relief is not appropriate on these facts.  Doc. 40 at 8, n. 5.  Because the Court GRANTED the Motions to Dismiss as to the actual claims, the Court need not address whether declaratory relief is appropriate.

standards of a defamation claim." Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 522 (4th Cir. 1999). Thus, claims for tortious interference cannot recover defamation-type damages without satisfying First Amendment standards. See, e.g., Shirvinski v. U.S. Coast Guard, 673 F.3d 308, 322 (4th Cir. 2012).

This case is somewhat different than the facts in controlling authority, as the issue in these Motions is whether Plaintiffs can evade the statute of limitations on defamation rather than whether they can evade the stricter standards of defamation. See Doc. 40 at 3–6; Pitman II, Doc 13 at 9–12; Doc 60 at 4–7.[6] Because Plaintiffs are attempting to plead tortious interference, the Court does not need to decide at this stage whether Plaintiffs must satisfy First Amendment standards to state a claim on these facts. Plaintiffs cannot seek general reputation damages under a tortious interference claim, and contrary to Defendants' arguments, Hustler and Food Lion do not control the applicability of First Amendment standards where a plaintiff is already foreclosed from seeking defamation damages.

On the statute of limitations argument, Plaintiffs contend that tortious interference with business expectancy has a five (5) year statute of limitations, e.g., Doc. 49 at 9 (citing Dunlap v. Cottman Transmission Sys., LLC, 287 Va. 207, 222 (2014)), and they further note that a plaintiff may allege defamation as the "improper method" for a tortious interference claim under Virginia law, id. (citing Dunn, McCormack & MacPherson v. Connolly, 281 Va. 553, 559 (2011)). In addition, Plaintiffs contend that they alleged multiple improper methods, citing the Complaint, which states: "improper methods, including, but not limited to, defamation, extortion, attempted extortion, conspiracy to commit extortion, witness retaliation and witness tampering." Doc. 49 at 9–10 (quoting Compl. ¶ 109).

---

[6] For the first time in their reply brief, Defendants Anna Richter and Bert Pitman raise the issue of whether Plaintiffs could satisfy the standards of proof for defamation. Doc. 62 at 5. No other Party addressed the issue, and it is not essential to deciding any of the instant Motions. Thus, the Court need not address that issue at this time.

While Plaintiffs are correct regarding the statute of limitations, one potential problem in Plaintiffs' argument is that Plaintiff PPSC cannot allege any claim, whether defamation or tortious interference, unless improper methods were used against it. A company whose officers or employees are defamed only has a cause of action for defamation when the alleged statements have a sufficient nexus with the business itself. See Schaecher v. Bouffault, 290 Va. 83, 99–100 (2015). The Complaint alleges that the posts at issue state that Plaintiff John Pitman was "Arrested by 6 Armed Officers," "intentionally withheld information from prosecutors that he was near bankruptcy (sic) when he struck a pay-to-testify deal in the Tracey Richter murder trial," has "on-going drug use," and engages in "pay-for-play with local strippers," "provid[ing] boob jobs for his pole dancing friends." Compl. ¶¶ 69–70. Further posts stated that he was involved in "various lawsuits," had "Vegas orgies" with Michael Roberts (Defendant Tracey Richter's second ex-husband), "prescribe[ed] pain pills for sex fueled nights," and "solicit[ed] prostitution for plastic surgery." Id. ¶¶ 71–72. Additional posts alleged that he "cheat[ed] on his wife Lisa Pitman with rapper Lachesis," financed a video for Lachesis "which has a brutal home invasion murder similar to th (sic)," and is a "baby raper." Id. ¶¶ 73–74. Almost all of these complaints appear personal to Plaintiff John Pitman because they discuss Plaintiff John Pitman's character and habits. Because the business is a health care practice that relies on the reputation of Plaintiff John Pitman, though, this case is distinguishable from the case law addressing defamation of employees. An attack on the principal of a health care practice is inevitably an attack on the health care practice. Furthermore, the allegations that Plaintiff John Pitman was engaging in "pay-for-play" with strippers or "soliciting prostitution for plastic surgery" relate to the business directly, even if the other posts did not suffice. Thus, the Court **FOUND** that those

facts are sufficient to support a tortious interference claim by Plaintiff PPSC as well as by Plaintiff John Pitman.

Although both Plaintiffs may articulate a timely claim on these facts, Plaintiff John Pitman may not be able to recover any damages under tortious interference. Only Plaintiff PPSC has business relationships subject to interference. The Complaint is not well pled on what exactly the damages are at issue, though, rendering it impossible to determine at this point whether Plaintiff John Pitman has any separate damages. Thus, the Court did not decide at this point whether Plaintiff John Pitman may claim any damages under the Complaint.

Plaintiffs' attempt to assert additional improper methods does not change the analysis above for either Plaintiff. Some of the alleged improper methods, such as extortion or attempted extortion, only apply to Defendants Xcentric and Magedson. Compl. ¶¶ 91–100. In addition, the core of all of the improper methods allegations is that Plaintiffs would suffer defamation if they did not perform as demanded, whether recanting testimony[7] or paying a certain amount of money. Id. ¶¶ 51–62, 91–100. Thus, the allegations of additional improper methods are subject to the same analysis offered herein for the improper method of defamation.

> ii.    *Whether Plaintiffs Pled Sufficient Facts to Allege Tortious Interference*

All Defendants raise three arguments regarding the elements of tortious interference: Plaintiffs fails to identify any specific expectancies, Defendants had no knowledge of any expectancies, and Defendants are not competitors of Plaintiffs. Doc. 40 at 6–8; Pitman II, Doc 13 at 13–16; Doc 60 at 7–12. To state a claim for tortious interference with business expectancy under Virginia law, a plaintiff must prove four elements: (1) the existence of a valid business expectancy; (2) knowledge of the expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the expectancy; and (4) resultant

---

[7] This would only apply to Plaintiff John Pitman personally.

damage to the party whose expectancy has been disrupted. Chaves v. Johnson, 230 Va. 112, 120 (1985). The plaintiff must also show that the interference used "improper methods." See Commerce Funding Corp. v. Worldwide Sec. Servs. Corp., 249 F.3d 204, 214 (4th Cir. 2001) (citing Maximus, Inc. v. Lockheed Info. Sys., Inc., 254 Va. 408, 413–14 (1997); Duggin v. Adams, 234 Va. 221, 226 (1987)). In addition, some case law suggests that there is an unstated fifth element that the defendant must be a competitor of the plaintiff. See, e.g., 17th St. Assocs., LLP v. Markel Int'l Ins. Co., 373 F. Supp. 2d 584, 601 (E.D. Va. 2005). Defendants encourage the Court to apply the fifth element. Doc. 40 at 7–8; Pitman II, Doc 13 at 15–16; Doc 60 at 10– 12. Plaintiffs insist that Virginia law does not require that element. Doc. 48 at 18–20; Doc. 49 at 13–15; Doc. 61 at 12–15. Thus, the arguments concern the first, second, and alleged fifth elements, which are discussed in turn below.

**a.      Existence of a Valid Business Expectancy**

Defendants argue that Plaintiffs fail to allege more than an expectancy of further business, which is not specific enough to satisfy the first element of tortious interference. Doc. 40 at 7; Pitman II, Doc 13 at 13–14; Doc 60 at 9. Plaintiffs counter that they "have alleged detailed facts about Pitman and his business dealings." Doc. 48 at 16; Doc. 49 at 11; Doc. 61 at 11. They cite several allegations supporting the fact that Plaintiffs lost future business as a result of Defendants' actions. See id.

Allegations of business relations or expectancies with third parties are insufficient to show the existence of a valid business expectancy for a tortious interference claim. See Jeffrey J. Nelson & Assocs., Inc. v. LePore, No. 4:11cv75, 2012 WL 2673242, at *10 (E.D. Va. July 5, 2012). Such allegations amount to the "general expectancy to remain in business," which is not

a cognizable expectancy under a tortious interference claim. <u>Masco Contractor Services East, Inc. v. Beals</u>, 279 F. Supp. 2d 699, 710 (E.D. Va. 2003).

Defendants have the better argument, as tortious interference requires allegations of <u>specific</u> expectancies, not merely allegations about <u>general</u> expectancies. Nevertheless, the Complaint alleges in particular that "potential clients/patients (who had paid deposits for surgeries) unilaterally cancelled their scheduled surgeries." Compl. ¶ 90. This allegation identifies specific future patients that Plaintiffs lost, and it ties them to more than a generalized expectation because it narrows the list specifically to those "who had paid deposits." <u>See id.</u> The flaw in this allegation is that it does not provide any detail on those specific expectancies, although it suggests that Plaintiffs could easily add relevant details with leave to amend. Thus, the Court **FOUND** that the Complaint fails to include sufficient specificity on business expectancies, but it expects that Plaintiffs can add that detail in their Amended Complaint.

**b.     Knowledge of the Expectancy on the Part of the Interferors**

Defendants argue that even if Plaintiffs alleged specific expectancies, there are no facts demonstrating that Defendants had knowledge of those specific expectancies. Doc. 40 at 7; Pitman II, Doc 13 at 14; Doc 60 at 9–10. Plaintiffs respond that Defendants had actual knowledge because of the information obtained by the conspiracy about Plaintiffs and their business practice, which included gathered intelligence as well as further knowledge provided by Plaintiff John Pitman's ex-wife Defendant Tracey Richter, who was familiar with his finances. Doc. 48 at 16–17 (citing Compl. ¶¶ 53–60, 89); Doc. 49 at 11–12 (citing same); Doc. 61 at 11 (citing same). Defendants reply that allegations of knowing about a plaintiff's business generally are insufficient to impute knowledge of specific business relationships. Doc. 53 at 4–5; Doc. 54 at 12–13; Doc 62 at 2. Defendant Tracey Richter additionally notes that she and Plaintiff John

Pitman divorced four (4) years before he started PPSC and that she is unfamiliar with his finances as to that business. Doc. 53 at 5 (citing Compl. ¶¶ 6, 26).

Defendants cite a couple of decisions in this District in support of their argument. In Mirafuentes v. Estevez, No. 1:15cv610, 2015 WL 8177935, at *1 (E.D. Va. Nov. 30, 2015), a journalist posted an article on Forbes.com with negative statements about plaintiff. In the complaint, plaintiff alleged facts showing that the journalist knew about her consulting business and that she lost specific business as a result of the journalist's statements. See id. at *5–6. The Court found that alleged facts showing knowledge of the consulting business did not show that the journalist knew about the specific business relationships at issue, and it dismissed the claim for failure to allege any facts extending general knowledge of the business to specific knowledge of those relationships. Similarly, in AdvanFort Co. v. Int'l Registries, Inc., No. 1:15cv220, 2015 WL 2238076, at *5 (E.D. Va. May 12, 2015), amended on reconsideration, No. 1:15cv220, 2015 WL 4254988 (E.D. Va. July 13, 2015), the Court found that facts showing knowledge that a maritime security contractor had business relationships with some ships and that defendant contacted all of those ships were insufficient to show that defendant knew about the specific business relationships with certain ships.

This case is distinguishable from Mirafuentes and AdvanFort because it involves a health care practice. While a consulting business or a maritime security contractor obtains a few large contracts that often become multi-year relationships, a health care practice involves a multitude of smaller, less profitable commercial relationships. Requiring the same level of specific knowledge for a health care practice's relationships as courts requires for businesses with fewer, larger contracts would effectively bar recovery for tortious interference for most health care practices. It is nearly impossible to interfere with a larger commercial relationship without

knowing the parties involved, but one can interfere with a patient relationship while maintaining ignorance of the patient's name. Furthermore, in the modern age, hackers and other malicious online actors can intentionally interfere with commercial relationships through directed online activity while maintaining some level of ignorance when the relationships involved are smaller relationships, such as the doctor-patient relationship, rather than large commercial contracts. The knowledge element of tortious interference is not intended to reward online actors who gather enough information to interfere while maintaining some limited ignorance because their methods are online. Defendants clearly had some level of knowledge of Plaintiffs' patient relationships based on the alleged facts. See, e.g., Compl. ¶¶ 54–60. While Defendant Tracey Richter argued that the knowledge she gained before the 1992 divorce would not give her any insight into the business expectancies of Plaintiffs twenty (20) years later, see Doc. 53 at 5 (citing Compl. ¶¶ 6, 26), it seems highly unlikely that she would be completely unfamiliar with her ex-husband's patients. Furthermore, Bert Pitman's investigations into the practice as part of the conspiracy may have involved obtaining detailed information about Plaintiffs' patients. Thus, the Court **FOUND** that Plaintiffs sufficiently alleged knowledge of the patient base.

c.      **Whether Interferors are Competitors of Plaintiffs**

Because the Parties dispute both the existence of this element as well as whether it applies, the Court would first need to resolve whether the element exists. Defendants are correct that this Court has suggested previously that this element exists. See, e.g., Jeffrey J. Nelson & Assocs., Inc., 2012 WL 2673242, at *10; Rescue Phone, Inc. v. Enf't Tech. Grp., Inc., No. 2:07cv58, 2007 WL 2045514, at *6 (E.D. Va. July 9, 2007). Other cases in the District also indicate that applying this element is appropriate. See 17th St. Assocs., LLP v. Markel Int'l Ins. Co., 373 F. Supp. 2d 584, 601 (E.D. Va. 2005).

Despite the discussion of an extra element in state and federal courts, the fact that Virginia state courts have typically faced competitors in tortious interference claims does not necessarily mean that it is an element of the claim. It may be good policy to restrict tortious interference to competitor claims, but the Virginia Supreme Court has never stated that such a restriction applies. The Court also does not believe that the Virginia Supreme Court would apply a competitor requirement in cases such as this one, where the fifth element would allow domestic disputes to metastasize into tortious interference cases without recourse in court. At this point, the only binding law from the Virginia Supreme Court is its four stated elements of this tort. The Court would need to refer the issue to the Virginia Supreme Court to determine whether it wants to add a fifth element, but the Court is not inclined to refer the question at this stage of the proceedings. In the absence of guidance from the Virginia Supreme Court, the Court **DECLINED** to require any extra elements for a tortious interference claim under Virginia law.

**d.    Conclusion**

The Court **DISMISSED** Count I because of Plaintiffs' insufficient allegations but **GRANTED LEAVE TO AMEND** to add further factual details.

*iii.    Whether the Conspiracy Counts (Counts II and III) Survive Dismissal of Count I*

Conspiracy claims in Virginia inherit the statute of limitations of the underlying tort. Compare Dunlap, 287 Va. at 222 (implying a five (5) year statute of limitations for business conspiracy based on a tortious interference claim because such claims involve injury to property) with Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 300 (4th Cir. 2012) (applying a two (2) year statute of limitations for business conspiracy based on claims involving personal injury). Cases applying a two (2) or five (5) year statute of limitations rely on Va. Code. Ann. § 8.01-243 (2017), which provides the respective limits for personal injury

actions and injury to property actions. Defamation actions are outside that statute, as Virginia separately provides a one (1) year limit for such actions. Va. Code Ann. § 8.01-247.1 (2017).

Defendants argue that the conspiracy claims here fail for two reasons: either they rely on a failed tortious interference claim, or they rely on a time-barred defamation claim. See Doc. 54 at 2–6; [8] Pitman II, Doc 13 at 9–12; Doc 60 at 4–7. Plaintiffs argue that even if the tortious interference claim fails, they can maintain conspiracy claims based on defamation, as all conspiracy claims are subject to a five (5) year statute of limitations. Doc. 48 at 21–29; Doc. 49 at 16–22; Doc. 61 at 16–22. Plaintiffs appear to seek a ruling that defamation against a business is an injury to property, controlled by the statute of limitations in Va. Code. Ann. § 8.01-243(B) (2017). Such a finding would contradict the clear legislative intent in id. § 8.01-247.1 to address defamation separately from § 8.01-243. As a result, the Court **FINDS** that if Plaintiffs' conspiracy claims rely on tortious interference, then the applicable statute of limitations is five (5) years, but if their conspiracy claims rely on defamation, then the applicable statute of limitations is one (1) year.[9] The Court **FOUND** that Counts II and III fail to state claims because the Court DISMISSED the underlying tortious interference claim and because any claim for conspiracy to defame is barred by the statute of limitations.

### iv. Conclusion

Thus, the Court **GRANTED** the three Claim Motions: Doc. 39; Pitman II, Doc. 11; and Doc. 59, **DISMISSING** Count I for insufficient facts to state a claim, **DISMISSING** Counts II and III as either dependent on Count I as an underlying tort or otherwise time-barred, and

---

[8] Defendants Xcentric and Magedson curiously argue in their initial memorandum that the personal injury two (2) year statute of limitations applies to any conspiracy action. Doc. 40 at 6 n. 3. Their argument appears to be a misreading of case law regarding personal injury conspiracies as addressing any conspiracy claim more broadly. They do not continue that argument in their reply brief, instead revising their arguments to conform to the other Defendants' positions. See Doc. 54 at 2–6. They also did not raise that argument at the hearing on these Motions.

[9] This analysis does not alter the fact that the Court is not deciding whether a business with an otherwise cognizable tortious interference claim may state such claim after more than one (1) year asserting defamation as the alleged wrongful method.

**DISMISSING** Counts IV and V as remedies that do not state independent claims, as a result **DISMISSING** the entire Complaint.

## VI. CONCLUSION

For the reasons stated above, The Court **ORDERS** as follows:

The Court **CONSTRUES** the Xcentric/Magedson Jurisdiction Motion, Doc. 37, as a Motion under Rule 12(i) for purposes of Defendant Xcentric.

The Court **DENIES** the two jurisdiction Motions: Doc. 37 and Pitman II, Doc. 10.

The Court **CONSTRUES** the Xcentric/Magedson Claim Motion, Doc. 39, as a Motion under Rule 12(c) for purposes of Defendant Xcentric.

The Court **GRANTS** the three Claim Motions: Doc. 39; Pitman II, Doc. 11; and Doc. 59, as a result **DISMISSING** Plaintiffs' Complaint.[10]

The Court **GRANTS** Plaintiffs **LEAVE TO AMEND** within eleven (11) days of the date of the hearing on these Motions, with a deadline of May 22, 2017. Defendants shall file their responses to the Amended Complaint within eleven (11) days of service.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May 22, 2017

---

[10] The Court also **DENIES AS MOOT** the remaining Motions in the consolidated docket, Pitman II, Docs. 5, 7, because they were copies of Motions addressed herein.