IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

JOHN M. PITMAN, III, et al.,

                    Plaintiffs,

v.                                               Civil Action No. 4:16cv179

XCENTRIC VENTURES, LLC., et al.,

                    Defendants.

## OPINION & ORDER

This matter is before the Court on two (2) related Motions to Dismiss Plaintiffs John M.

Pitman III's ("John Pitman's") and Peninsula Plastic Surgery Center's ("PPSC's") (collectively,

"Plaintiffs'") Complaint: Defendants Xcentric Ventures, LLC's ("Xcentric's") and Edward

Magedson's ("Magedson's") (collectively, "Company Defendants'") Motion to Dismiss, Doc.

71, and Defendants Tracey Richter's, Anna Richter's, and Bert Pitman's (collectively, "Family

Defendants'") Motion to Dismiss, Doc. 73.   For the reasons stated herein, the Court

**DISMISSES** Plaintiff John Pitman from Claim III, retaining that claim solely for Plaintiff PPSC,

**DISMISSES** Counts IV and V, and otherwise **DENIES** the instant Motions to Dismiss.

## I.    BACKGROUND

**A.**    **Factual Allegations[1]**

This action arises from postings on the website Ripoff Report alleging negative facts

---

[1] "In considering a motion to dismiss, [the Court] accept[s] as true all well-pleaded allegations and view[s] the complaint in the light most favorable to the plaintiff." Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005) (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993)).  The Court cautions, however, that the facts alleged by Plaintiffs are recited here for the limited purpose of deciding the instant Motion to Dismiss.  The recited facts are not factual findings upon which the parties may rely for any other issue in this proceeding.

about Plaintiffs John Pitman and PPSC. See generally Doc. 67 ("Am. Compl."). Ripoff Report is a website run by Defendant Xcentric and created by Magedson. Id. ¶¶ 11, 13, 16. It allows anonymous posting and uses coding and search engine optimization to cause its pages to appear near the top of search engine results. Id. ¶¶ 21–22. It also pays for some of the content it posts. Id. ¶ 23.

The facts culminating in the posts on Ripoff Report start with Plaintiff John Pitman's and Defendant Tracey Richter's marriage on August 14, 1988. Id. ¶ 26. They had one child, Defendant Bert Pitman, who was born on February 1, 1990. Id. They separated in June 1992 and engaged in approximately six (6) years of contentious divorce proceedings. Id. After the divorce, Defendant Tracey Richter met and subsequently married Michael Roberts ("Roberts") in 1996.[2] Id. ¶ 27.

In 1998, Defendant Tracey Richter and Roberts moved to Early, Iowa, where Defendant Tracey Richter befriended her neighbor Dustin Wehde ("Wehde"). Id. ¶ 28. In 2000, Roberts was jailed on domestic violence charges. Id. ¶ 29. Around December 2001, when Defendants Tracey Richter and Bert Pitman were at home, Defendant Tracey Richter fired eleven shots at Wehde using two different weapons, nine of which hit his body. Id. ¶ 30. Defendant Tracey Richter claimed she was acting in self-defense. Id. ¶ 31. A journal found in Wehde's car, which appeared to be Wehde's journal, indicated that he was hired by Plaintiff John Pitman and his attorney to "stalk, harass and ultimately murder" Defendants Tracey Richter and Bert Pitman. Id. Plaintiff John Pitman was never arrested or charged with any connection to the murder. Id. ¶ 33. Approximately two (2) years after the murder, Wehde's estate filed a civil action against Defendant Tracey Richter, but that case was ultimately dismissed. Id. ¶ 36. In 2004, Roberts

---

[2] The Amended Complaint, like the initial Complaint, does not clarify how Tracey Richter could marry again in 1996 after a six (6) year divorce proceeding that started in 1992.

and Defendant Tracey Richter filed for divorce. Id.

In November 2010, a new county attorney decided to investigate the death of Wehde. Id. ¶ 40. Defendant Tracey Richter was arrested on July 27, 2011. Id. ¶ 41. Prior to the start of Defendant Tracey Richter's trial, Defendant Darren Meade ("Meade") became interested in the trial. Id. ¶ 45. He was aware of her because of a prior contentious relationship with Roberts. Id. At the trial, various witnesses testified against Defendant Tracey Richter, including her ex-husband, Plaintiff John Pitman. Id. ¶ 47. On November 7, 2011, a jury found Defendant Tracey Richter guilty of murdering Wehde. Id.

In the days following Defendant Tracey Richter's conviction, Defendant Bert Pitman, Defendant Meade, and Defendant Tracey Richter's mother, Defendant Anna Richter, began discussing how to overturn the conviction. Id. ¶ 48. All four of those Defendants began planning in December 2012 to investigate witnesses and have those witnesses recant their trial testimony in order to overturn Defendant Tracey Richter's conviction. Id. ¶ 51. Defendant Bert Pitman performed his investigative work in Virginia, contacting PPS employees and gathering information in Virginia to further their efforts. Id. ¶ 52, 59. Defendant Meade was an employee or agent of Defendant Xcentric, and he used the website Ripoff Report to post stories about the witnesses in Defendant Tracey Richter's murder trial. Id. ¶ 53. Defendant Bert Pitman contacted employees of Plaintiff PPSC as well as Plaintiff John Pitman's ex-girlfriends. Id. ¶¶ 55, 58. The other three Defendants in this plan also began gathering information regarding Plaintiffs John Pitman and PPSC. Id. ¶¶ 54–58. Defendant Meade also gathered information regarding Roberts. Id. ¶ 57.

Defendant Meade told Defendant Magedson about Defendant Tracey Richter's trial, and Defendant Xcentric employed Defendant Meade in an attempt to exonerate Defendant Tracey

Richter. Id. ¶ 60. Defendant Magedson also asked Defendant Anna Richter for information about Plaintiff John Pitman and others to post on Ripoff Report. Id. ¶ 61. Defendant Anna Richter sent weekly packages of information concerning Defendant Tracey Richter and her trial to Defendants Meade, Magedson, and Xcentric. Id. ¶ 62. Defendants Xcentric and Magedson were interested in this story because they saw an opportunity to post the stories and then charge Plaintiffs substantial fees to edit or remove the posts. Id. ¶ 64.

After Richter's conviction, several posts appeared on Ripoff Report over time regarding her trial, at least some of which were authored by Defendant Meade. Id. ¶ 65. Defendant Meade used information from Defendants Tracey Richter, Anna Richter, and Bert Pitman to compose his online posts, and Defendants Xcentric and Magedson paid him for those posts. Id. ¶ 67. On September 11, 2012, Defendant Meade posted a complaint outlining his own version of the facts of Wehde's murder. Id. ¶ 66. On September 21, 2012, he posted a complaint which had a title alleging that there was a "Bounty Shared Amongst Prosecution Witnesses" at Defendant Tracey Richter's murder trial. Id.

The posts on Ripoff Report began specifically targeting Plaintiffs after the Court of Appeals of Iowa affirmed Defendant Tracey Richter's murder conviction on January 9, 2013. Id. ¶ 70. Defendant Tracey Richter sought to target Plaintiff John Pitman with complaints in retaliation for his refusal to recant his testimony in her murder trial. Id. Defendant Anna Richter told Defendant Bert Pitman that "after what [Pitman] did to [Richter] I want him to know how it feels to have his name in the paper and not in a good way." Id. ¶ 75.

On January 21, 2013, a post appeared on Ripoff Report with the following title:

Dr. John Pitman III, MD Peninsula Plastic Surgery Center, Pitman Surgical Associates, Estranged Ex Husband Key Witness Arrested by 6 Armed Officers at Plastic Surgery Practice, United States Army Col Office Locations: Williamsburg, Hayes, Newport News Embarrassment to the prosecution knowingly lies in court,

4

> deadbeat hack plastic surgeon, United States Army Reserve Cornel Lisa Pitman Williams, Virginia

Id. ¶ 71. The text of that post stated that:

> John Pitman, intentionally withheld information from prosecutors that he was near bankrutcy (sic) when he struck a pay-to-testify deal in the Tracey Richter murder trial. Pitman, notorious for his on-going drug use and his pay-for-play with local strippers had his car repossessed; and continued to provide boob jobs for his pole dancing friends.

Id. ¶ 72. The post included a picture of Plaintiff John Pitman, and several updates to the post discussed various lawsuits in which he was allegedly involved. Id. ¶ 73. One update to that post was titled "Dr. John Pitman and Michael Roberts, Vegas orgies, she/he and he/he twister, doctor prescribing pain pills for sex fueled nights." Id. ¶ 74. The text of that update referred to him as "Dr. Boob Job" and alleged that he was "soliciting prostitution for plastic surgery." Id.

> A second post also originated on January 21, 2013. This post was titled:

> Dr. John Pitman cheats on wife Lisa Pitman with rapper Lachesis. Dr John Pitman broke with multiple tax IRS tax liens, finances video for Lachesis which has a brutal home invasion murder similar to th (sic) husband cheats on dead fish wife Lisa Pitman, Allisan Tucker, Tracey Richter murder trial, sac county iowa Williamsburg, Virginia.

Id. ¶ 76.

> A third post of unknown date also addressed Plaintiff John Pitman. The post was titled:

> Tracey Richter falsely convicted. Ben Smith Sac County Iowa Michael Roberts Rexxfield Exposed Audio recording proves Prosecutor's friend Michael Roberts motive and opportunity, confesses he claimed Dr. John Pitman baby raper. Sydney Morning Herald disgrace Sac City Iowa

Id. ¶ 77. Plaintiffs also allege upon information and belief that there were additional posts about Plaintiffs on Ripoff Report beyond these three posts. Id. ¶ 82.

Plaintiffs had a successful plastic surgery business that was growing before these complaints were posted online. Id. ¶¶ 83–92. They allege that the business "had substantial

5

goodwill" and that John Pitman's skill and the goodwill were the "business's greatest asset." Id.
¶¶ 84, 87. They further allege that Tracey Richter knew the business expectancies of his practice
and that the remaining Defendants gained an understanding through their investigation of
Plaintiffs. Id. ¶ 92. They also allege that as a result of these posts, they lost existing clients, lost
potential clients who had paid deposits for surgeries, and experienced a decline in new business.
Id. ¶ 93. They state that their cases dropped "from approximately 111 cases in 2012 to 82 cases
in 2013 and 2 cases in 2014." Id.

On August 29, 2013, an employee of Defendant Xcentric contacted Plaintiffs, advising
that Defendant Xcentric would remove the posts about Plaintiffs from Ripoff Report if they
made two (2) payments of $10,000 followed by monthly payments in perpetuity. Id. ¶¶ 94–96.
This was one of multiple attempts by Defendant Xcentric to obtain money from Plaintiffs. Id.
¶ 97. Defendant Bert Pitman also made an offer in Virginia to Plaintiffs to contact the owners of
Ripoff Report on behalf of himself, Defendant Tracey Richter, and Defendant Anna Richter. Id.
¶ 98. Plaintiffs advised Defendant Xcentric that the posts were false, but Defendant Xcentric
refused to remove the posts without payment and continued to demand payment. Id. ¶¶ 99–101.[3]

Defendant Xcentric continues to display these posts on Ripoff Report. Id. ¶ 104. It also
has a post on its front page entitled "Free Tracey Richter" that facilitates finding the posts about
Plaintiffs. Id. ¶¶ 105–06. This front page post includes a link to the Free Tracey Richter Legal
Defense Fund, which counts Defendant Magedson among its donors. Id. ¶ 107.

**B.    Procedural History**

Plaintiffs filed suit in the Circuit Court for Williamsburg/James City County, Virginia on
October 6, 2016. See generally Compl. Many procedural difficulties in removal and subsequent

---

[3] Plaintiff has two (2) paragraphs with the number ninety-nine (99) and two (2) paragraphs with the number one
hundred (100), but they generally discuss the same issue.

acts are discussed at length in this Court's prior Orders and need not be repeated here. See Docs. 57, 68.

The current Amended Complaint was filed with leave of Court on May 22, 2017. Doc. 67. The Xcentric Defendants and Family Defendants filed their respective instant Motions to Dismiss on June 2, 2017. Docs. 71, 73. Plaintiffs responded in opposition on June 16, 2017. Docs. 80, 81. The Xcentric Defendants and Family Defendants respectively replied on June 22, 2017. Docs. 82, 83. The Final Pretrial Conference is scheduled for November 20, 2017, and trial is scheduled for December 5, 2017. See Doc. 58.

## II.    LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss tests the sufficiency of a complaint; it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Venkatraman, 417 F.3d at 420 ("In considering a motion to dismiss, we accept as true all well-pleaded allegations and view the complaint [or counterclaim] in the light most favorable to the plaintiff [or counterclaim plaintiff]") (citing Mylan Labs., 7 F.3d at 1134). A complaint establishes facial plausibility "once the factual content of a complaint allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 678). Therefore, the complaint need not include "detailed factual allegations" as long as it pleads "sufficient facts to allow a court, drawing on judicial experience and common sense, to infer

7

more than the mere possibility of misconduct." Id. Although a court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

In deciding the motion, a court may consider the facts alleged on the face of the complaint as well as "'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" Moore v. Flagstar Bank, 6 F. Supp. 2d 496, 500 (E.D. Va. 1997) (quoting 5A Charles A. Wright & Arthur R. Miller, et al., Fed. Prac. & Proc. Civ. § 1357 (1990)). The court may look to documents attached to the complaint and those incorporated by reference without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. See Pueschel v. United States, 369 F.3d 345, 353 n.3 (4th Cir. 2004) (citations omitted).

### III. ANALYSIS

#### A. Whether Plaintiffs Pled Sufficient Facts to Allege Tortious Interference

All Defendants raise three (3) arguments regarding the elements of tortious interference: that Plaintiffs still fail to identify specific expectancies, that Defendants did not have knowledge of specific expectancies, and that Plaintiffs fail to allege causation. Doc. 72 at 2–9; Doc. 74 at 4–8. The Xcentric Defendants add one (1) additional argument: that they are not competitors of Plaintiffs. Doc. 72 at 9–13.

To state a claim for tortious interference with business expectancy under Virginia law, a plaintiff must prove four elements: (1) the existence of a valid business expectancy; (2) knowledge of the expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the expectancy; and (4) resultant damage to the party whose

8

expectancy has been disrupted. <u>Chaves v. Johnson</u>, 230 Va. 112, 120 (1985). The plaintiff must also show that the interference used "improper methods." <u>See</u> <u>Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.</u>, 249 F.3d 204, 214 (4th Cir. 2001) (citing <u>Maximus, Inc. v. Lockheed Info. Sys., Inc.</u>, 254 Va. 408, 413–14 (1997); <u>Duggin v. Adams</u>, 234 Va. 221, 226 (1987)). In addition, some case law suggests that there is an unstated fifth element that the defendant must be a competitor of the plaintiff. <u>See, e.g.</u>, <u>17th St. Assocs., LLP v. Markel Int'l Ins. Co.</u>, 373 F. Supp. 2d 584, 601 (E.D. Va. 2005). The Xcentric Defendants reprise their argument encouraging the Court to apply the fifth element. Doc. 72 at 8–13. Plaintiffs reprise their arguments that Virginia law does not require that element. Doc. 80 at 9–11. Thus, the common arguments concern the first, second and third elements, and the Xcentric Defendants' additional argument concerns the alleged fifth element. Those elements are discussed in turn below.

### i.    Existence of a Valid Business Expectancy

In its previous Order, this Court rejected Plaintiffs' argument that they only needed to allege general expectancies but found some allegations of specific expectancies in the Complaint and gave Defendants leave to add further necessary detail. Doc. 68 at 27. Plaintiffs amended the relevant paragraph as follows:

> After posts concerning the Plaintiffs began appearing on the Ripoff Report and with prominence in search engine results, the Plaintiffs business declined dramatically. Specifically, clients/patients left the practice, potential clients/patients (who had paid deposits for surgeries) unilaterally cancelled their scheduled surgeries, and new business declined dramatically. For example, ~~Pitman's~~ Plaintiff's cosmetic cases dropped from approximately ~~90~~ 111 cases in 2012 to ~~15~~ 82 cases in 2013 and 2 cases in 2014.

Am. Compl. ¶ 90 (strikethroughs and underlining added to show deletions and additions, respectively). Plaintiffs failed to remove the general expectancies of future patients from the

Complaint, leaving the allegation unclear on what portion of the reductions in 2013 and 2014 was cancellation as opposed to merely a decline in business. The Complaint alleges that the interference occurred in early 2013, see id. ¶¶ 70–82, leading to the plausible inference that at least the twenty-nine (29) fewer cases in 2013 were patients who had paid deposits, if not all one hundred and thirty eight (138) lost patients.

The Xcentric Defendants and the Family Defendants both insist that these updated allegations insufficiently plead specific expectancies, as they do not know the identity or quantity of the lost expectancies. Doc. 72 at 2–4; Doc. 74 at 4–7. Plaintiffs respond that they are not required to identify specific patients at the 12(b)(6) stage, that the entire decline from one hundred and eleven (111) to two (2) patients resulted from the interference, and that identifying patients may be a violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"). Doc. 80 at 5–6 & n. 1. They concede that summary judgment "may be appropriate" if they do not produce the requisite evidence before that time. Id. at 6 n. 2.

Plaintiffs plead enough to survive a motion under Rule 12(b)(6). Presuming that their facts are true, they should be able to produce evidence that they had expectancies with one hundred and thirty eight (138) patients and that Defendants interfered with those expectancies. Their pleading sets a high bar for their evidentiary burden. Nevertheless, their Amended Complaint is specific enough that the Court cannot justifiably dismiss it, and the Court **FINDS** that the Amended Complaint includes sufficient specificity on business expectancies to survive a Motion to Dismiss.

### ii.   *Knowledge of the Expectancy on the Part of the Interferors*

Defendants reprise their argument that they must have had knowledge of the specific patients with whom they allegedly interfered in order to satisfy the specific knowledge element

of tortious interference.  Doc. 72 at 4–7; Doc. 74 at 7–8.  Plaintiffs respond that they sufficiently alleged knowledge of their business expectancies.  Doc. 80 at 6–7.

This Court's previous observation is still true that no Party cites any case addressing what qualifies as specific enough knowledge for a health care practice's expectancies.  Defendants continue to insist that other cases are analogous enough that the Court should require allegations that Defendants knew of the individual patient expectancies at issue.  Doc. 72 at 5–7; Doc. 74 at 7–8.  Plaintiffs insist that they alleged enough facts to demonstrate specific knowledge.  Doc. 80 at 6–7; Doc. 81 at 8–9.

Given the allegations in this case, the Court does not need to further examine the standard for specific knowledge.  Plaintiffs allege that the investigation by all Defendants, as well as Plaintiff John Pitman's prior marriage to Defendant Tracey Richter, provided the requisite knowledge of the expectancies at issue in this case.  Am. Compl. ¶ 92.  Presuming that allegation is true at this stage, Defendants had specific knowledge of the expectancies at issue under any standard for specific knowledge.  Thus, the Court **FINDS** that Plaintiffs sufficiently alleged knowledge of the expectancies in this case.

     *iii.*     *Whether Defendants' Actions Caused the Termination of Expectancies*

Defendants argue that Plaintiffs have no pleadings regarding causation.  Doc. 72 at 8–9; Doc. 74 at 6–7.  This is not true.  The Amended Complaint alleges that patients saw the posts. See, e.g., Am. Compl. ¶ 83.  It also alleges that the posts harmed Plaintiffs through loss of patients who read the postings.  See, e.g., id. ¶ 101.  It even states that "[t]he actions of the Defendants also caused patients to cancel their surgeries and other medical procedures with the Plaintiffs."  Id. ¶ 113 (emphasis added).  The Amended Complaint may not be a model of pleading, but that is no reason to dismiss a case under Rule 12(b)(6).  Plaintiffs will still need to

prove causation, but the Court cannot assess whether Plaintiffs have the requisite evidence at this stage. Thus, the Court **FINDS** that the Complaint adequately alleges causation.

*iv.*     *Whether Interferors are Competitors of Plaintiffs*

On this issue, the Court previously stated:

> Despite the discussion of an extra element in state and federal courts, the fact that Virginia state courts have typically faced competitors in tortious interference claims does not necessarily mean that it is an <u>element</u> of the claim. It may be good policy to restrict tortious interference to competitor claims, but the Virginia Supreme Court has never stated that such a restriction applies. The Court also does not believe that the Virginia Supreme Court would apply a competitor requirement in cases such as this one, where the fifth element would allow domestic disputes to metastasize into tortious interference cases without recourse in court.

Doc. 68 at 30. The Xcentric Defendants express their displeasure with this decision by citing persuasive authority favoring their position. Doc. 72 at 9–13. They cite no binding authority requiring reconsideration of the Court's decision. The Court **DECLINES** to require any extra elements for a tortious interference claim under Virginia law.

*v.*     *Conclusion*

Because the Court **FINDS** that the Complaint adequately alleges the four (4) elements of tortious interference, the Court **DENIES** the Motion to Dismiss as to Count I.

**B.**     **Whether Count I is Subject to the Defamation Statute of Limitations**

The Xcentric Defendants reprise the statute of limitations argument. Doc. 72 at 17–18. They cite authority from other circuits applying other states' laws, where those states hold that the defamation statute of limitations applies when a tortious interference claim alleges defamation as the wrongful method of interference. See <u>id.</u>

Virginia law allows Plaintiffs to assert defamation as the improper method. See <u>Dunn, McCormack & MacPherson v. Connolly</u>, 281 Va. 553, 559 (2011) (quoting <u>Duggin v. Adams</u>,

12

234 Va. 221, 227–28 (1987)). No Virginia court has addressed whether a different statute of limitations applies to tortious interference claims when the wrongful method is defamation.

This Court previously allowed Plaintiffs to pursue their claim but observed that individual reputation damages that would fit the tort of defamation may not be proper. Plaintiffs continue to seek individual reputation damages under tortious interference. See, e.g., Am. Compl. ¶¶ 101(j), 116.[4] It seems that defamation is properly a part of a tortious interference claim under Virginia law, but it also seems that allowing full defamation damages under tortious interference would undermine the distinctions between the two torts. While the Xcentric Defendants observe that some states resolve this issue by imposing a harsher statute of limitations, this Court believes that the better approach is to allow the claim but restrict the damages to tortious interference damages. Accordingly, the Court **FINDS** that an otherwise properly pled tortious interference claim under Virginia law may assert defamation as the wrongful method within five (5) years of the alleged actions but cannot seek any reputation damages. Thus, the Court **DISMISSES** any claims for reputation damages by the individual plaintiff, John Pitman, in Count I of the Amended Complaint, but otherwise **DENIES** the Motion to Dismiss Count I as time-barred.

C.    **Whether Plaintiff John Pitman Is a Proper Party**

Defendants argue that all of the damages in this case accrue to Plaintiff PPSC, not to Plaintiff John Pitman personally. Doc. 72 at 13–17 (asserting lack of standing and lack of damages); Doc. 74 at 8–9 (asserting lack of damages). Plaintiffs respond that Plaintiff John Pitman "may recover for injuries to his reputation and his financial or business standing" or "at least nominal damages." Doc. 80 at 13, Doc. 81 at 11.

---

[4] Speculative damage claims do not defeat the existence of actual pled damages and thus do not change the outcome of the instant Motion, but Plaintiffs will not be able to enlarge their damage claims beyond tortious interference by bald assertions in the Complaint, either.

The Court previously observed that Plaintiffs would need to plead damage to Plaintiff John Pitman's patient base, which is either his or his practice's goodwill in this case, and could not seek general reputation damages for Plaintiff John Pitman individually. See Doc. 66 at 63–64. The other damages claims undoubtedly belong to the practice. Plaintiffs renewed pleading of reputation damages for the individual Plaintiff suggests that they lack evidence on damages. Nevertheless, they did at least plead a near total collapse of the patient base. See Am. Compl. ¶ 93 (pleading a reduction to two (2) patients in a year). Plaintiffs need not prove their pleadings that the interference actions caused damage to Plaintiff John Pitman at this stage of the proceeding. While it seems unlikely that they will offer sufficient evidence to demonstrate causation on individual damages, that issue is better addressed at summary judgment.

The Xcentric Defendants also separately observe that Claim III is a claim for statutory business conspiracy and that at least Claim III should be limited to Plaintiff PPSC. Doc. 72 at 15–16. They note that business conspiracy concerns conduct "directed at one's business, not one's person." Id. at 15 (quoting Buschi v. Kirven, 775 F.2d 1240, 1259 (4th Cir. 1985)) (emphasis in original). The purpose is to prevent recovery of personal reputation and employment interests under the statute. See id. (citing Spencer v. Am. Int'l Grp., No. 3:08cv591, 2009 WL 47111 at *11 (E.D. Va. Jan. 6, 2009). Plaintiff responds by citing authority in this District where the Court permitted a solo practitioner lawyer to state a claim for business conspiracy based on attacks on her that inevitably damaged her business as well. Doc. 80 at 16 (citing Daniczek v. Spencer, 156 F. Supp. 3d 739, 765–766 (E.D. Va. 2016).

The Xcentric Defendants are correct that Plaintiff John Pitman cannot seek business conspiracy damages. Daniczek is distinguishable because it involved a timely claim for defamation and thus a timely a business conspiracy claim based on defamation. See id. at 754.

14

That case is further distinguishable because it allowed the plaintiff to claim business damages when her practice was not a co-plaintiff. Id. at 766. Here, Plaintiff PPSC is properly before the Court as a party and can directly seek the business damages at issue. Furthermore, as this Court has already explained, it will not permit general reputation damages when there is no timely defamation claim. Thus, the Court **DISMISSES** Plaintiff John Pitman from Claim III, retaining that claim solely for Plaintiff PPSC.

D.     **Whether Defendant Magedson is a Proper Party**

Defendant Magedson contends that he is not a proper party in his individual capacity because there are no claims against him except as an agent of Xcentric, and he claims immunity under the intracorporate immunity doctrine. Doc. 72 at 14–15. Plaintiffs respond that he took an "independent personal stake" in the actions at issue and is thus individually liable. Doc. 80 at 13–14.

The problem with Defendant Magedson's argument is that the intracorporate immunity doctrine only immunizes him from a conspiracy with his corporation, not with others. See, e.g., Buschi v. Kirven, 775 F.2d 1240, 1251 (4th Cir. 1985). Plaintiffs allege that he conspired with five (5) different Defendants, including the corporation. See, e.g., Am. Compl. ¶ 61. Even if the doctrine applied, he would still be conspiring with four (4) Defendants under these allegations. He may dispute the factual accuracy of his personal involvement in the conspiracy, but that is not an issue for resolution at the Motion to Dismiss stage. Thus, the Court retains Defendant Magedson in his individual capacity.

E.     **Whether Counts IV and V are Proper Claims**

The Xcentric Defendants seek dismissal of these claims again, arguing that declaratory relief is improper and that injunctive relief is a remedy, not a claim. Doc. 72 at 18–19. The

15

Court previously DISMISSED both of these counts as "remedies that do not state independent claims." Doc. 68 at 32. These claims are still merely assertions of remedies. The Court will address those claims for relief if proceedings reach that stage, and Plaintiffs need not maintain them as separate counts. Thus, the Court **DISMISSES** Counts IV and V because they are remedies, not claims.

## VI.    CONCLUSION

For the reasons stated above, the Court **DISMISSES** Plaintiff John Pitman from Claim III, retaining that claim solely for Plaintiff PPSC, **DISMISSES** Counts IV and V, and otherwise **DENIES** the Motions to Dismiss, Docs. 71, 73.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August 29, 2017

16